## NO. 23-1620

In The

# United States Court Of Appeals
## For The Fourth Circuit

## CARON NAZARIO,

*Plaintiff - Appellant,*

## v.

## JOE GUTIERREZ, In his Personal Capacity;
## DANIEL CROCKER, In his Personal Capacity,

*Defendants - Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT NORFOLK**

––––––––––––

**BRIEF OF APPELLANT**

––––––––––––

**Jonathan M. Arthur**
Thomas H. Roberts
 & Associates, P.C.
**105 South 1st Street**
**Richmond, VA 23219**
**(804) 991-4308**

*Counsel for Appellant*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 23-1620      Caption: Nazario v. Gutierrez, et. al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Caron Nazario
(name of party/amicus)


who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/Jonathan M. Arthur, Esq.            Date:    6/15/2023

Counsel for: Caron Nazario

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES PRESENTED.............................................2

STATEMENT OF THE CASE .............................................................3

SUMMARY OF THE ARGUMENTS ..................................................16

ARGUMENT AND AUTHORITIES...................................................20

    I.    The District Court Erred in Determining that Gutierrez and
Crocker Had Probable Cause .........................................................20

        STANDARD OF REVIEW – PROBABLE CAUSE ON
SUMMARY JUDGMENT..................................................................20

        ANALYSIS ..............................................................................21

        I.    PROBABLE CAUSE ..............................................21

            A.    ELUDING..............................................21

            B.    OBSTRUCTION OF JUSTICE ....................26

            C.    FAILURE TO OBEY – VIRGINIA CODE § 18.2-
464 ..............................................................33

            D.    THE ERROR IS REVERSIBLE ....................35

    II.    The District Court Erred in Determining that Gutierrez and
Crocker Were Entitled to Qualified Immunity for Counts I, II,
and IV and Dismissing them on Summary Judgment.........................35

        STANDARD OF REVIEW QUALIFIED IMMUNITY ON
SUMMARY JUDGMENT..................................................................35

i

ANALYSIS ...................................................................36

    A.    COUNT II – EXCESSIVE FORCE ...............................36

    B.    COUNT IV – FIRST AMENDMENT RETALIATION.............................................................41

    C.    COUNT I – UNREASONABLE SEIZURE .................42

III.    THE DISTRICT COURT ERRED IN GIVING INSTRUCTION NUMBERS 26 AND 27-A....................................................45

STANDARD OF REVIEW – JURY INSTRUCTION ERROR ........45

ANALYSIS ...................................................................46

CONCLUSION.....................................................................47

REQUEST FOR ORAL ARGUMENT ....................................48

CERTIFICATE OF COMPLIANCE........................................49

# TABLE OF AUTHORITIES

**Page(s):**

## Cases

*Bazemore v. Commonwealth*,
    42 Va. App. 203, 590 S.E.2d 602 (Va. Ct. App. 2004)................................22

*Bellote v. Edwards*,
    629 F.3d 415 (4th Cir. 2011) ........................................................................27

*Betton v. Bleue*,
    942 F.3d 184 (4th Cir. 2019) ........................................................................38

*BeVier v. Hucal*,
    806 F.2d123 (7th Cir. 2019) .........................................................................24

*Brown v. City of Danville*,
    44 Va. App. 586, 606 S.E.2d 523 (Va. Ct. App. 2004)................................27

*Brown v. City of Golden Valley*,
    574 F.3d 491 (8th Cir. 2009) ........................................................................37

*Clem v. Corbeau*,
    284 F.3d 543 (4th Cir. 2002) .................................................................19, 44

*Coffee v. Morris*,
    401 F. Supp. 2d 542 (W.D. Va 2005)................................................30, 31, 32

*Collins v. Commonwealth*,
    No. 2080-06-02, 2007 WL 4523117 (Va. Ct. App. Dec. 27, 2007).....30, 31, 32

*Cooper v. Sheehan*,
    735 F.3d 153 (4th Cir. 2013) ........................................................................38

*Cromartie v. Billings*,
    298 Va. 284, 837 S.E.2d 247 (Va. Sup. Ct. 2020) ...........................27, 30, 32

iii

*Dent v. Montgomery County Police Dept.*,
  745 F. Supp. 2d 648 (D. Md. 2010)..............................................................37

*Estate of Armstrong v. Village of Pinehurst*,
  810 F.3d 892 (4th Cir. 2016) ..............................................................*passim*

*Foote v. Commonwealth*,
  11 Va. App. 61, 396 S.W.2d 851 (Va. Ct. App. 1990) .................................40

*Franklin v. City of Charlotte*,
  64 F.4th 519 (4th Cir. 2023) ........................................................28, 29, 33, 39

*Gnadt v. Commonwealth*,
  27 Va. App. 148, 497 S.E. 2d 887, 888 (Va. Ct. App. 1998).......................40

*Graham v. Connor*,
  490 U.S. 386 (1989)............................................................................*passim*

*Graham v. Gagnon*,
  831 F.3d 176 (4th Cir. 2016) .......................................................................21

*Hartman v. Moore*,
  547 U.S. 250 (2006)..............................................................................19, 42

*Henry v. Purnell*,
  652 F.3d 524 (4th Cir. 2011) .......................................................................37

*Housley v. Holquist*,
  879 F. Supp. 2d. 472 (D. Md., 2011)...........................................................38

*Illinois v. Caballes*,
  543 U.S. 405 (2005).....................................................................................44

*Illinois v. Gates*,
  462 U.S. 213 (1983)......................................................................................21

*Jones v. Commonwealth*,
  141 Va. 471, 126 S.E. 74 (Va. S. Ct. 1925) ................................................27

iv

*Jones v. Commonwealth*,
　71 Va. App. 375, 836 S.W.2d 710 (Va. Ct. App. 2019) ...............................23

*Kowalczuk v. Giese*,
　No. 19-cv-1230 2021 WL 1192412 (E.D. Wis. Mar. 30, 2021) .............25, 26

*Lozman v. City of Rivera Beach*,
　138 S. Ct. 1945 (2018)................................................................................41

*Manners v. Canella*,
　891 F.3d 959 (11th Cir. 2018) ...................................................................25

*McCracken v. Commonwealth*,
　39 Va. App. 254, 572 S.E.3d 493 (Va. Ct. App. 2002)................................40

*Nazario v. Gutierrez*,
　2020 U.S. Dist. LEXIS 19530 (E.D. Va. February 2, 2022)........................41

*Nieves v. Bartlett*,
　139 S. Ct. 1715 (2019)....................................................................19, 41, 42

*Palmer v. Commonwealth*,
　143 Va 592, 130 S.E. 398 (1925) ...............................................................40

*Parady v. Commonwealth*,
　2023 Va. App. LEXIS 428 (Va. Ct. App. 2023) ..........................................23

*Parham v. Commonwealth*,
　2005 Va. App. LEXIS 581, No. 1544-04-2 (Va. Ct. App. 2005) ................25

*Park v. Shiflett*,
　250 F.3d 843 (4th Cir. 2001) ................................................................37, 40

*Rodriguez v. United States*,
　575 U.S. 348 (2015)....................................................................................43

*Rogers v. Pendleton*,
　249 F.3d 279 (4th Cir. 2001) .....................................................................27

*Rowland v. Perry*,
    41 F.3d 167 (4th Cir. 1994) ................................................................*passim*

*Ruckman v. Commonwealth*,
    28 Va. App. 428, 505 S.E.2d 388 (Va. Ct. App. 1988) ................................27

*Scott v. Harris*,
    550 U.S. 372 (2007) ................................................................21, 36

*Sevingy v. Dicksey*,
    846 F.2d 953 (4th Cir. 1988) ................................................................21, 24

*Sims v. Labowitz*,
    885 F.3d 254 (4th Cir. 2018) ................................................................19, 44

*Smith v. Ray*,
    781 F.3d 95 (4th Cir. 2015) ................................................................*passim*

*Terry v. Ohio*,
    392 U.S. 1 (1968) ................................................................24, 25

*United States v. Campbell*,
    850 F. App'x 178 (4th Cir. 2021) ................................................................45

*United States v. Graham*,
    686 Fed. Appx. 166 (4th Cir. 2017) ........................................................33-34

*United States v. Hassler*,
    992 F.3d 243 (4th Cir. 2021) ................................................................45

*United States v. Hill*,
    852 F.3d 377 (4th Cir. 2017) ................................................................19, 44

*United States v. Hill*,
    252 Fed. App. 532 (4th Cir. 2007) ........................................................24

*United States v. Miller*,
    925 F.2d 695 (4th Cir. 1991) ................................................................20

*United States v. Miltier,*
    882 F.3d 81 (4th Cir. 2018) ........................................................45

*United States v. Slocumb,*
    804 F.3d 677 (4th Cir. 2015) ......................................................24

*United States v. Sokolow,*
    490 U.S. 1 (1989) .......................................................................24

*United States v. Underwood,*
    845 F. App'x 239 (4th Cir. 2021) .........................................45, 47

*United States v. Williams,*
    808 F.3d 238 (4th Cir. 2015) ......................................................44

*Williams v. Strickland,*
    917 F.3d 763 (4th Cir. 2019) ......................................................44

*Wilson v. Kittoe,*
    337 F.3d 392 (4th Cir. 2003) ......................................................27

*Wingate v. Fulford,*
    987 F.3d 299 (4th Cir. 2021) ..........................................20, 24, 36

*Young v. Equinor USA Onshore Props., Inc.,*
    982 F.3d 201 (4th Cir. 2020) ......................................................35

## Federal Statutes

28 U.S.C. § 1291 ..............................................................................2

28 U.S.C. § 1294 ..............................................................................2

28 U.S.C. § 1331 ..............................................................................1

28 U.S.C. § 1367 ..............................................................................1

42 U.S.C. § 1983 ..........................................................1, 14, 15, 16

vii

## **Virginia Statutes**

Va. Code § 18.2-460 ................................................................2, 17, 26

Va. Code § 18.2-464 ............................................................2, 18, 33, 34

Va. Code § 19.2-59 ..............................................................1, 15, 47, 48

Va. Code § 46.2-113 ........................................................................4

Va. Code § 46.2-715-716 ..............................................................38

Va. Code § 46.2-717 ........................................................................4

Va. Code § 46.2-718 ........................................................................4

Va. Code § 46.2-817 ..................................................................*passim*

Va. Code § 46.2-1052 .....................................................................3

## **Constitutional Provisions**

U.S. Const. amend. I ................................................................*passim*

U.S. Const. amend. IV ..........................................................1, 2, 47

## **Rules**

Fed. R. Civ. Pro. 50.........................................................................1

Fed. R. Civ. Pro. 56....................................................................20, 35

Fed. R. Civ. Pro. 59....................................................................1, 16

## **Other Cited Sources**

Black's Law Dictionary (8th. Ed. 1999)....................................22

## JURISDICTIONAL STATEMENT

This appeal arises from a civil suit under 42 U.S.C. § 1983, from the Eastern District of Virginia, Norfolk Division. The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. **JA29**, **JA31**. Prior to trial, on cross-motions for summary judgment, the District Court granted Gutierrez and Crocker qualified immunity for Lt. Nazario's unreasonable detention claim under the Fourth Amendment (Count I), his excessive force claim under the Fourth Amendment (Count II), and his First Amendment retaliation claims (Count IV). The District Court found Crocker liable for an illegal search pursuant to both the Fourth Amendment (Count III) and Virginia's statutory law (Count VIII) and allowed a jury to determine the damages. The District Court permitted Lt. Nazario's common law claims of assault (Count V), battery (Count VI), and false imprisonment (Count VII) against both officers, and the statutory illegal search claim as to Gutierrez (Count VIII), to proceed to trial. **JA801**.

At trial, the jury awarded damages against Crocker on Lt. Nazario's 42 U.S.C. § 1983 Fourth Amendment and Virginia Code § 19.2-59 unreasonable search claims. The jury found Gutierrez liable and awarded damages for common law assault. The jury found in Crocker's and Gutierrez's favor for the remaining claims. The District Court entered judgment on January 18, 2023. On May 4, 2023 the District Court amended this judgment based on Lt. Nazario's Fed. R. Civ. P. 50 and 59 motions.

**JA926-927**. Lt. Nazario noted his appeal on June 1, 2023. **JA928-930**. This Court therefore has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1294. The appeal is from a final order or judgment that disposes of all parties' claims.

### STATEMENT OF ISSUES PRESENTED

1.    Whether the District Court erred by deciding on summary judgment that Gutierrez and Crocker had probable cause to believe that Lt. Nazario committed misdemeanor eluding as defined in Virginia Code § 46.2-817, misdemeanor obstruction of justice as defined in Virginia Code § 18.2-460, and failure to obey an order of a conservator of the peace as defined in Virginia Code § 18.2-464.

2.    Whether the District Court erred in dismissing Count I (unreasonable seizure of Lt. Nazario's person under the Fourth Amendment) on summary judgment based on qualified immunity.

3.    Whether the District Court erred in dismissing Count II (excessive force under the Fourth Amendment) on summary judgment based on qualified immunity.

4.    Whether the District Court erred in dismissing Count IV (First Amendment retaliation) on summary judgment based on qualified immunity.

5.    Whether the District Court erred in giving jury instruction numbers 26 and 27-A.

## STATEMENT OF THE CASE

Because this appeal challenges a summary judgment decision and the jury instructions, the facts are stated in the light most favorable to Lt. Nazario.

On December 5, 2020, at approximately 18:34 (6:34 p.m.), Officers Gutierrez and Crocker conducted a traffic stop of Lt. Nazario in the town of Windsor, Virginia. **JA802**. Gutierrez and Crocker were sworn officers of the Town, on duty, and acting under the color of law. **JA802**. Crocker was receiving field training under Gutierrez, and previously conducted between ten and seventy traffic stops. **JA398**, **JA437**, **JA659-660.** The Windsor Police Department has existed for 20 years and is not an accredited police agency. **JA510**. It has never lost an officer in the line of duty. **JA509-510**.

The officers initiated the stop while Lt. Nazario was driving westbound on US 460 in a 2020 Chevrolet Tahoe, in the vicinity of the Food Lion. **JA343, JA747**. The Tahoe had seating for five or more people. Its rear window and side passenger windows had factory tint. **JA319**. Virginia law has no applicable tint restrictions for the rear or side-rear windows for this type of vehicle. Va. Code § 46.2-1052(H). Lt. Nazario leased the Tahoe in September of 2020, in New York. The New York dealer affixed the temporary tags inside the rear window, in the upper right corner inside the rear window. **JA319**.

During the COVID-19 emergency, the Virginia Governor repeatedly extended the times to register vehicles, although the extension expired about a month prior to the traffic stop. **JA733-746**. The officers of the Windsor Police Department knew of the changes to the DMV registration requirements, via the National Law Enforcement Telecommunications System. **JA547-549**.

Lt. Nazario had a valid Virginia concealed carry permit. **JA320, JA480**. On December 5, 2020, Lt. Nazario legally possessed a firearm in his vehicle, concealed—that is, not in plain view—in a pocket on the driver's side of the center console of his vehicle. **JA345, JA477**. During this traffic stop, Lt. Nazario made no threatening statements or gestures to the officers. **Videos CN-1, CN-2, CN-3, CN-4, CN-5**.

Crocker alleged that he initiated a traffic stop, turning on his emergency lights, because he believed Lt. Nazario lacked a rear license plate. **JA328**, **JA343-344; Video CN-4 at 18:34:21**. Failure to properly display a license plate is not a crime in Virginia, but a traffic infraction. Va. Code §§ 46.2-113, -717 and -718. Crocker stated, "From my training at the police academy, I knew that the combination of a newer model vehicle without license tags _**can**_ be the sign of a stolen vehicle." **JA327-328 (emphasis added)**. However, at the time of his depositions, Crocker had never recovered a stolen vehicle during a traffic stop. **JA441-442**.

Promptly after Crocker activated his lights, Lt. Nazario slowed, driving 22 to 23 miles per hour, below the posted 35 mile per hour speed limit, and then slowed to around 18 miles per hour.  **Video CN-4 at 18:34:24 to 18:35:47,[1] JA319-320**. Both Crocker and Gutierrez knew this.  **JA383, JA434-436, JA664-665**.  Lt. Nazario slowed to signal his intent to pull over.  **JA319-320**.  Lt. Nazario drove to the most well-lighted space he could see, a BP Gas station, used his turn signal appropriately to enter the gas station parking lot, parked the car, and turned off the vehicle.  He did this for both his safety and for the officers' safety.  **Video CN-4, 18:34:22 to 18:36:06, JA319-320**.  The Food Lion is approximately 1.1 miles from the BP gas station.[2] **JA285, JA685-686**.  Crocker activated his emergency lights about a minute and forty seconds before Lt. Nazario pulled into the BP Gas station.  **Video CN-4 at 18:34:24 to 18:36:06**.

As Lt. Nazario parked, Crocker decided to conduct a "high-risk" (or "felony") traffic stop, though he had not witnessed a felony.  **JA439-440**.  Neither had Gutierrez.  **JA687**.  Crocker claims that, though he had never seen a vehicle slow down and continue driving in this manner, he "had to consider the ***possibility*** that a driver traveling at a slow rate of speed would more likely have the ability to prepare

---

[1] This brief uses the timestamps in the upper right side of the body worn camera video for reference.

[2] The BP Gas Station is also less than a mile from where Lt. Nazario realized that Crocker was attempting to stop him particularly.  **JA319-320.**

5

for aggressive action such as pulling or loading a firearm or jumping out and fleeing on foot." **JA328-329, JA441 (emphasis added)**.

Almost immediately after Lt. Nazario stopped, and before Crocker reported the felony traffic stop by radio, rather having only reported a traffic stop,[3] Gutierrez arrived, and both officers exited their vehicles and drew their firearm, pointing them at Lt. Nazario's vehicle. **Video CN-4 at 18:36:00 to 18:36:11, Video CN-3 at 18:36:01 to 18:36:13**. At this time, both officers' body worn cameras show Lt. Nazario's license plate in the upper right of the rear window of his vehicle. **Video CN-3 at 18:37:01, Video CN-4 at 18:36:20**. During the traffic stop, Crocker, admits to having seen the license plate while approaching Lt. Nazario's car. **Video CN-5 at 19:02:26 to 19:02:42, JA428**.

Crocker yelled, "Driver, roll the window down!" **Video CN-4 at 18:36:11-18:36:13**. He commanded the driver to "Put your hands out the window!" within nine seconds, followed by a command to "Turn the vehicle off. Put your hands out the window!" **Video CN-4 at 18:36:22 to 18:36:25**. Within fifteen seconds of the initial command, Lt. Nazario had a window down and a hand out. **Video CN-4 at 18:36:26**. After five seconds, Lt. Nazario asked, "What's going on?" and Crocker yells again, "Put your hands out the window, and turn the vehicle off!" **Video CN-**

---

[3] Crocker does not report the traffic stop as a felony traffic stop until after both he and Gutierrez have exited their vehicles with their firearms drawn. **Video CN-3 at 18:36:18**, **Video CN-4 at 18:36:14**.

6

**4 at 18:36:31 to 18:36:35**.  By **Video CN-4 at 18:36:40**, the brake lights go off, with the vehicle remaining in place.  Crocker yelled again, "Put your hands out the window!"  By **Video CN-4 at 18:36:42 to 18:36:46**, Lt. Nazario complied (i.e., the vehicle was parked, off, and Lt. Nazario had at least one hand visible out the window).  But although Crocker stated that he "couldn't tell" from his vantage point whether Lt. Nazario was complying, **Video CN-4 at 18:36:26 to 18:36:32**, he told Gutierrez that Lt. Nazario was ***not*** complying, notwithstanding the fact that Lt. Nazario was complying.  **Video CN-4 at 18:36:46**.  At **Video CN-4 18:36:50**, Crocker yelled, "Let me see your hands!"  Lt. Nazario, who activated his video camera on his phone, because he looked in his mirrors and saw officers with their firearms drawn and thought he was going to be murdered, **JA220-221**, began to record the traffic stop.  **Video CN-1 and Video CN-2**.  Crocker the demanded to know, "How many occupants are in the vehicle?"  Lt. Nazario responded, asking, "What's going on?" and Crocker repeated his question.  Lt. Nazario responded truthfully, "It's only myself.  Why are your weapons drawn?  What's going on?"  **Video CN-1 at 0:05 to 0:19; Video CN-4 at 18:36:50 to 18:37:01**.  Meanwhile, Gutierrez crossed behind Crocker and trained his weapon on Lt. Nazario.  **Video CN-3 at 18:36:55 to 18:37:01**.  Crocker then yelled, "Open the door slowly and step out.  Open the door!"  **Video CN-4 at 18:36:50 to 18:37:05**.  But Lt. Nazario could not both keep his hands outside of the vehicle and open the door to exit, as the door

was locked and his seatbelt was on. **JA320, Video CN-4 at 18:39:49 to 18:40:05**. A series of mutually inconsistent commands followed. For example, over the course of six seconds, Gutierrez and Crocker twice told Lt. Nazario to keep his hands outside of the vehicle and three times told him to exit the vehicle. **Video CN-4 at 18:37:27**. All of this occurred within fifty-five seconds of Crocker drawing his weapon and issuing the first command.

Over the next thirty seconds, the officers repeatedly yelled at Lt. Nazario to get out of the vehicle. He calmly declined once, and repeatedly asked, "What's going on?" The officers advanced to the point that Lt. Nazario could turn and talk face to face with Gutierrez, which he did, and the officers could see Lt. Nazario's hands. **Video CN-4 at 18:36:50 to 18:37:35; Video CN-1 at 0:19 to 0:49; Video CN-3 at 18:37:08 to 18:37:38**. About 15 seconds later, Gutierrez responded to Lt. Nazario's repeated inquiry "What's going on?" by stating, "What's going on is your fixin' to ride the lightning, son." **Video CN-3 at 18:37:59**, **Video CN-4 at 18:37:53**. This was the first explanation that any officer had given to Lt. Nazario for the detention or their actions, or in answer to his questions "What's going on?" Gutierrez was aware that a colloquial meaning of "ride the lightning" is execution by the electric chair. **JA689–690**. Lt. Nazario heard "What's going on is your fixin' to ride into the light," but he understood this as a death threat, nevertheless. **JA221**. Lt. Nazario had not threatened either officers in word or deed, had his vehicle off,

and (as verbally acknowledged by Gutierrez) had his hands clearly displayed outside the vehicle. **Video CN-4 at 18:37:27 to 18:37:57; Video CN-3 at 18:37:29 to 18:37:59; Video CN-1 at 0:43 to 1:12**. Gutierrez then switched to brandishing a Taser and walked directly toward the vehicle door. Lt. Nazario kept his hands up, outside the window, but moved his head so it was within the vehicle. **Video CN-3 at 18:38:02**.

The officers then placed themselves adjacent, or nearly adjacent, to the vehicle, both pointing their weapons at Lt. Nazario. Lt. Nazario's hands were clearly visible and raised outside the window of the vehicle. Crocker stated, "Sir, just get out of the car. Work with us and we'll talk to you. Get out the car." Gutierrez then told this uniformed, peaceable military officer, who he had just threatened, "You received an order. Obey it." Lt. Nazario responded, with hands raised, "I'm honestly afraid to get out. Can I—" Gutierrez interrupted Lt. Nazario and affirmed that Lt. Nazario should be afraid to get out of the vehicle (that is to be afraid to comply with their orders) saying, "Yeah, you should be." **Video CN-3 at 18:38:04 to 18:38:21**. Gutierrez then tried to open the door of the vehicle himself and failed because it was locked. **Video CN-4 at 18:38:17**. The officers, at this time were within an arm's reach of Lt. Nazario, who was speaking calmly and directly to them, with hands raised outside the vehicle, in clear sight. Gutierrez then stated Lt. Nazario had been stopped for a traffic violation and now was being detained for obstruction of justice.

9

**Video CN-4 at 18:38:21 to 18:38:37**.  This was the first time any officer had even *attempted* to explain to Lt. Nazario what was going on.

Five seconds later, Gutierrez grabbed Lt. Nazario, over Lt. Nazario's verbal protests.  He then released Lt. Nazario and unholstered his OC spray as Lt. Nazario asked him not to "do that."  Crocker placed his arm inside the vehicle, underneath Lt. Nazario's raised arms, without Lt. Nazario taking any hostile action toward the officers.  Despite this, Gutierrez told Crocker to back up, and sprayed Lt. Nazario at least four times in rapid succession with OC spray.  **Video CN-4 at 18:38:37 to 18:39:20**.

Gutierrez and Crocker then repeated their orders to Lt. Nazario to exit the vehicle.  Lt. Nazario exited the vehicle with his arms raised.  Gutierrez ordered Lt. Nazario to get on the ground.  Within seconds of Lt. Nazario's feet touching the pavement, and with Lt. Nazario's hands up and open, and eyes shut from the OC spray, Gutierrez grabbed Lt. Nazario, and he and Crocker forced Lt. Nazario to the ground, striking Lt. Nazario in the neck and legs.  **Video CN-4 at 18:39:20 to 18:41:00**.  The officers placed Lt. Nazario in handcuffs and threatened to OC spray him again while Lt. Nazario began to sob.  **Video CN-4 at 18:41:00 to 18:41:55**.  After placing Lt. Nazario in handcuffs, the officers placed Lt. Nazario on a trashcan about five feet away from Lt. Nazario's vehicle.  At no time prior to or after

10

Gutierrez sprayed the OC did Lt. Nazario raise his voice, threaten the defendants, or remove his hands from their view.

After the defendants placed Lt. Nazario on the trashcan, EMTs arrived, and Crocker obtained Lt. Nazario's license, which he ran through NCIC and VCIN to determine if Lt. Nazario had any outstanding warrants.  Lt. Nazario had no warrants. At that time, dispatch also informed Crocker that Lt. Nazario had a valid Virginia concealed carry permit.  **JA476**.

Lt. Nazario informed the officers he had a firearm in his vehicle, **Video CN-4 at 18:53:10**.  Crocker then searched Lt. Nazario's vehicle for the firearm, because Lt. Nazario told him the firearm was there, **JA478**, and he did that with all the firearms he interacted with.  **JA480-481**.

Crocker and Gutierrez alleged they had probable cause to arrest and charge Lt. Nazario for (1) failure to display a license plate, (2) eluding, (3) obstruction of justice, and (4) assault on a law enforcement officer.  **JA345, JA748**.  Towards the end of the video footage, roughly half-way through the traffic stop, in the presence of Crocker, and with Lt. Nazario still in handcuffs, and understanding that criminal charges could end Lt. Nazario's military career, Gutierrez made the following offer to Lt. Nazario, without Crocker objecting: If Lt. Nazario fought them over their actions or if he argued about how they conducted themselves which was his right as a citizen, the officers would charge Lt. Nazario, have Lt. Nazario go to court, and

notify his military command.  But if Lt. Nazario would chill and let this go, the officers wouldn't file charges and would take the handcuffs off and let Lt. Nazario go.  **Video CN-5 at 19:05:55 to End**.  The officers admitted Lt. Nazario's complaints about the traffic stop would have been constitutionally protected.  **Video CN-5 at 19:06:17 to 19:10:34**.

Lt. Nazario agreed, and the officers removed the handcuffs and remained with him at the scene as the effects of the OC abated to a point where the officers felt it was safe for Lt. Nazario to drive.  Then the officers permitted Lt. Nazario to drive home.  **JA332**, **JA490**.

In all, the officers detained Lt. Nazario for approximately one hour and twenty minutes. **Video CN-4 at 18:36:10**, **JA490-492**, **JA669-671**.[4]  Crocker stated that a standard traffic stop lasts no longer than seven to ten minutes.  **JA405-406**. Gutierrez stated that it should take fifteen to twenty minutes.  **JA672-673**.  Thus, this traffic stop took *at least* one hour longer than a standard traffic stop.

The officers then returned to their headquarters and drafted reports they use to testify in court, in which they are legally obligated to be truthful.  **JA342, JA379-386, JA661-663, JA747**.  These reports alleged Lt. Nazario struck officer Crocker, committed eluding, obstruction (*with force* for Crocker and without force with

---

[4] Crocker exits his vehicle at 18:36:10 and states in his deposition that they release Lt. Nazario at 19:55, making the duration of the traffic stop approximately one hour and twenty minutes.

Gutierrez), *and* assault on a law enforcement officer. **JA345, JA748**. Crocker drafted witness subpoenas for himself and Gutierrez for any subsequent criminal trial of Lt. Nazario arising out of their allegations. **JA387**.

Regarding the eluding charge, Crocker did not know the definition of willful and wanton conduct, one of the elements of Virginia's eluding statute (Va. Code. § 46.2-817). He claimed "willful" meant willfully and willingly, without force, and that "wantonly" meant continuing to do so with knowledge of what is going on, or with disregard. He further alleged that he got these definitions from the Virginia Code, **JA430-431**, which it is not.

Regarding obstruction of justice with force, Crocker, characterized Lt. Nazario's behavior at **Video CN-4 at 18:42** as "active resistance." **JA470**. Gutierrez described these same actions as "physical resistance" when the officers attempted to "lower him to the ground to be secured by handcuffs." **JA755**. When asked where the video footage showed Lt. Nazario pulling away from Gutierrez's grip (a further allegation contained in the officers' reports, **JA344**, **JA747**) Gutierrez identified **Video CN-4 at 18:38:40 to 18:38:43** and **Video CN-3 at 18:38:40 to 18:38:45**, (**JA721-725**). Crocker identified: **Video CN-3 at 18:39:03 and 18:39:07**. **JA485-486**. This footage does not show Lt. Nazario pulling away from Gutierrez. Rather it shows Gutierrez releasing Lt. Nazario so Gutierrez could unholster his OC spray.

The officers predicated the potential assault on a law enforcement officer charge on an allegation that Lt. Nazario smacked Crocker's hand away. **JA460-461.** When asked where the video showed Lt. Nazario smacking his hands away, Crocker stated it happened before Gutierrez OC sprayed Lt. Nazario. **JA461-462.** He Crocker admitted the video didn't show it. He further admitted that he was aware the video didn't show it when he was typing his report. **JA462-465.** Gutierrez, however, admitted not only that the videos did not show it, but that it did not happen. **JA713, JA715**.

With respect to the eluding allegations, Gutierrez admitted on the scene that, given the race relations between minorities and law enforcement, waiting to pull into a well-lighted space was reasonable, that is it happens to law enforcement all the time, and when it does, eighty percent of the time it is a minority. **Video CN-5 at 19:10:42 to 19:11:04**. Crocker admitted that he understood why Lt. Nazario had waited to pull over, attributing it to the tensions between "us" (law enforcement) and "ya'll" (minorities). **Video CN-5 at 19:03:19 to 19:03:32**.

Lt. Nazario filed an eight-count complaint against the officers on April 2, 2021. Count I alleged an unreasonable seizure of Lt. Nazario's person under 42 U.S.C. § 1983 for prolonging the traffic stop. **JA49**. Count II alleged excessive force under 42 U.S.C. § 1983. **JA51**. Count III alleged an illegal search under 42 U.S.C. § 1983. **JA54**. Count IV alleged First Amendment retaliation under 42

U.S.C. § 1983.  **JA57**.  Count V alleged common law assault.  **JA58**.  Count VI

alleged common law battery.    **JA60**.    Count VII alleged common law false

imprisonment.  **JA60**.  Count VIII alleged an illegal search in violation of Virginia

Code § 19.2-59.  **JA62**.

On August 9, 2022 the Court issued its order and memorandum opinion on

cross-motions for summary judgment.  **JA761-801**.  The Court determined Crocker

and Gutierrez had probable cause for eluding, obstruction of justice, and failure to

obey (a charge mentioned at no time prior to litigation), and dismissed Counts I, II,

and IV.  The Court's probable cause determination factored into its decision to grant

the officers qualified immunity on each of these counts.  The Court granted Lt.

Nazario's motion for summary judgment against Crocker on Counts III and VIII

(state and federal illegal search) reserving the issue of damages for the jury.  **JA801**.

The Court denied the cross-motions for summary judgment regarding Counts III and

VIII as they pertained to Gutierrez and Counts V through VII for Crocker and

Gutierrez.  **JA801.**

The case proceeded to trial.  The probable cause determination limited the

testimony Lt. Nazario's use of force expert could offer.  **JA826**.  The Court, over Lt.

Nazario's objection, **JA856-858**, gave instructions based on its determination that

the officers had probable cause for charges of eluding, obstruction, and failure to

obey and discussed it with the jury.  **JA859-862**, **JA895-897**.  The jury returned a

verdict in Crocker's favor regarding Lt. Nazario's common law claims of assault, battery, and false imprisonment.  It returned a verdict of zero dollars in compensatory damages and declined to award punitive damages against Crocker for the 42 U.S.C. § 1983 illegal search claim, and a damages verdict of zero dollars in compensatory damages and $1,000.00 in punitive damages against Crocker for the state law illegal search claim.  The jury returned a verdict in Gutierrez's favor for Lt. Nazario's common law battery, false imprisonment, and the illegal search claims, but returned a verdict against Gutierrez for the common law assault claim and awarded Lt. Nazario $2,685.00 in compensatory damages.

On January 18, 2023, the District Court entered judgment in the matter.  Post-trial motions followed.  On May 3, 2023, the District Court denied Lt. Nazario's motions for judgment notwithstanding the verdict and for a new trial.  The District Court granted Lt. Nazario's Fed. R. Civ. P. 59(e) motion. **JA926**.  On May 4, 2023, the court entered an amended judgment. **JA927**.  Lt. Nazario filed his notice of appeal on June 1, 2023. **JA928**.  This appeal follows.

## SUMMARY OF THE ARGUMENTS

I. The District Court erred in determining that Crocker and Gutierrez had probable cause to believe that Lt. Nazario had committed any violation apart from a minor traffic infraction.

I(a). A reasonable well-trained officer with similar training and experience, and who was reasonably prudent, would not have believed that Lt. Nazario, after slowing down to below the posted speed limit in response to police lights, driving just over a mile in a little over one minute forty seconds, signaling before pulling into the well-lighted parking lot of a BP Gas station, and placing his vehicle in park and turning it off, was trying to or had tried to elude them in violation of Virginia Code § 46.2-817.

I(b). A reasonable well-trained officer with similar training and experience, and who was reasonably prudent, would not have believed that Lt. Nazario had obstructed justice under Virginia Code § 18.2-460. This reasonable officer would have believed that Lt. Nazario's actions were a self-defensive reaction to the officers' surprising and unjustified use of force, threats, and assault, making Lt. Nazario's reactions justified and therefore not obstruction under the statute.

This reasonable officer would not have believed that Lt. Nazario had taken any positive act to *prevent* the officer from performing their duties as opposed to just making it more difficult when Lt. Nazario refused to exit the vehicle and get on the ground. This is especially true given the officers' knowledge of the officers' conduct leading to Lt. Nazario's refusal.

I(c). A reasonable well-trained officer with similar training and experience, and who was reasonably prudent, would not have believed that Lt. Nazario had

refused to bring himself to the officer in violation of Virginia Code § 18.2-464, after submitting to their show of authority, pulling over in a safe, well-lighted space, complying with their commands to turn his vehicle off and place his hands outside the vehicle, remaining calm and polite with his hand open and displayed, and answering the officers' questions.

Further, as neither Gutierrez or Crocker mentioned *any* violation of Virginia Code § 18.2-464 *prior* to this litigation, the District Court should not even consider the claim that Gutierrez and Crocker had probable cause for this misdemeanor violation.

II. The District Court erred in granting Gutierrez and Crocker qualified immunity for and dismissing Count II (excessive force) on summary judgment. Its analysis of the factors as set forth in *Graham v. Connor*, 490 U.S. 386 (1989), was adversely colored by the erroneous probable cause ruling. When this error is corrected, the factors set forth in *Graham* strongly favor Lt. Nazario. Therefore, the Court erred in granting Gutierrez and Crocker qualified immunity and dismissing Count II on summary judgment. *See, e.g.*, *Rowland*, 41 F.3d at 173-74; *Smith*, 781 F.3d at 102 (when the *Graham* factors strongly favor the plaintiff a court should not grant qualified immunity to a defendant).

III. The District Court erred in granting Gutierrez and Crocker qualified immunity for and dismissing Count IV (First Amendment retaliation) on summary

judgment because the District Court's analysis was wholly predicated on its erroneous probable cause determination, based on the standard announced in *Nieves v. Bartlett*, 139 S. Ct. 1715, 1728 (2019). When this error is corrected, *inter alia, Hartman v. Moore,* 547 U.S. 250 (2006), requires the court to deny the officers qualified immunity.

IV. The District Court erred in granting Gutierrez and Crocker qualified immunity for and dismissing Count I (unreasonable seizure of Lt. Nazario's person by unreasonably prolonging the traffic stop) on summary judgment. The District Court's analysis incorporated its erroneous probable cause decision. When this is corrected, the force the officers used—including brandishing firearms, yelling threats, deploying OC spraying, delivering knee strikes, and employing handcuffs—was objectively unreasonable and prolonged the traffic stop in violation of, *inter alia, United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017).

Further, prolonging a traffic stop by excessive use of force is manifestly unconstitutional based on general applications of the core constitutional principles. *Sims v. Labowitz,* 885 F.3d 254, 263 (4th Cir. 2018) (citing *Clem v. Corbeau*, 284 F.3d 543, 553 (4th Cir. 2002)). And qualified immunity should not be granted based on the assertion that a particular *mode* of unreasonably extending the traffic stop has not been previously litigated.

V.  Given the District Court's error in determining that Gutierrez and Crocker had probable cause to believe Lt. Nazario had committed any offense other than a minor traffic infraction, the District Court erred in giving jury instruction numbers 26 and 27-A, which incorporated the erroneous probable cause rulings.

## ARGUMENT AND AUTHORITIES

## I.   The District Court Erred in Determining that Gutierrez and Crocker Had Probable Cause.

### STANDARD OF REVIEW –
### PROBABLE CAUSE ON SUMMARY JUDGMENT

This Court reviews probable cause determinations *de novo*.  *United States v. Miller*, 925 F.2d 695, 698 (4th Cir. 1991).  As this determination was on Summary Judgment, the Court will apply that standard of review as well. Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Ordinarily, when a district court's grant of summary judgment disposes of cross-motions for summary judgment, this Court considers each motion separately on its own merits, resolving all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion. *Wingate v. Fulford*, 987 F.3d 299, 304 (4th Cir. 2021).  However, when the parties tell two different stories, one of which is blatantly contradicted by the video evidence, or

record, so that no reasonable juror could believe it, a court should not adopt that version of the facts, but the video or record's version, for purposes of reviewing or ruling on summary judgment. *Scott v. Harris*, 550 U.S. 372, 379-81 (2007).

## ANALYSIS

### I.    PROBABLE CAUSE

Probable cause to justify an arrest means facts and circumstances within the officers' knowledge warrant a prudent officer, one of reasonable caution, in believing the suspect has committed or is committing an offense.  This is an objective inquiry taking into account the totality of the circumstances.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Courts consider two factors: (1) the suspect's conduct as actually known or reasonably knowable to the officer, and (2) the contours of the offense at issue.  *E.g. Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016); *Sevingy v. Dicksey*, 846 F.2d 953, 957, n.5 (4th Cir. 1988).  The officer's subjective state of mind is not relevant, but his perception of the objective facts of the incident is.  *See Rowland v. Perry*, 41 F.3d 167, 173 (1994) (discussing the objective analysis in the qualified immunity context).

### A.    ELUDING

Under Virginia Code § 46.2-817(A):

Any person who, having received a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle in a willful and wanton disregard of such signal or who attempts to escape or elude such law-enforcement officer whether on

21

foot, in the vehicle, or by any other means, is guilty of a Class 2 misdemeanor.

Neither officer had probable cause to believe Lt. Nazario was eluding them. They lacked it prior to Lt. Nazario stopping at the gas station. They lacked it once Lt. Nazario stopped. They lacked it when they trained their firearms on Lt. Nazario. They lacked it when Gutierrez threatened that Lt. Nazario would ride the lightning. They lacked it when Gutierrez confirmed that Lt. Nazario should be afraid to comply with their commands, all while Crocker failed to intervene. They lacked it when they attempted to extort his silence. They lacked it when they went back to the police station and drafted their false reports. The District Court erred in ruling the officers had probable cause to believe Lt. Nazario was eluding.

Eluding prohibits only willfully and wantonly disregarding the officers' signal and attempting to escape. A reasonable well-trained and experienced officer would have had to believe that Lt. Nazario (1) lacked justification for continuing to drive below the speed limit, (2) was driving in such a way that was indifferent to the danger that it created for the safety of others, or (3) was attempting to escape the officers. *See Misconduct: Willful and Wanton Misconduct* Black's Law Dictionary 1020 (8th ed. 1999); *Bazemore v. Commonwealth*, 42 Va. App. 203, 222-23, 590 S.E.2d 602, 611-12 (Va. Ct. App. 2004).

Lt. Nazario responded to the signal from Crocker by slowing his vehicle below the posted speed limit and continuing the safe and orderly operation of the

vehicle, driving in a straight course for roughly a minute and forty seconds prior to stopping at a well-lighted gas station, for everyone's safety. The officers understood (and a reasonable officer would have understood) that by slowing the vehicle, Lt. Nazario signaled his willingness to comply and was looking for a place to safely stop. This was reasonable and happens all the time, especially when the driver is a minority, given the climate between minorities and law-enforcement; thus, the officers admitted the reasonableness of this conduct on camera.[5]

No reasonable, well-trained, prudent, and reasonably cautious officer would have believed Lt. Nazario lacked justification for his actions, was disregarding the safety of others while driving, or was attempting to escape in violation of Virginia Code § 46.2-817.[6] While Crocker has testified that he had to "prepare for the *possibility*" that Lt. Nazario would flee, this was merely a (mistaken) hunch, which

---

[5] These statements provide some evidence on how a reasonable, well-trained, prudent officer would have viewed these facts as well as how Gutierrez and Crocker perceived these facts as they deployed. *See Rowland*, 41 F.3d at 173.

[6] Crocker's was unable to articulate the actual definition of *wanton*, one of the elements of Va. Code § 46.2-817. **JA430-431.** This ignorance does not alter the analysis, because a reasonable and well-trained officer would know what constitutes *wanton* actions. Mistake of law based on the officer's inadequate study of the law cannot provide probable cause. *Jones v. Commonwealth*, 71 Va. App. 375, 382-84, 836 S.W.2d 710, 714 (Va. Ct. App. 2019); *Parady v. Commonwealth*, 2023 Va. App. LEXIS 428 at *21-22 (Va. Ct. App. 2023).

does not provide probable cause.[7] *E.g. Terry v. Ohio*, 392 U.S. 1, 28 (1968); *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *United States v. Hill,* 252 Fed. App. 532, 534 (4th Cir. 2007); *see, also United States v. Slocumb*, 804 F.3d 677, 682 (4th Cir. 2015); *Wingate v. Fulford*, 987 F.3d 299, 306-07 (4th Cir. 2021)[8] (discussing innocuous, legal activities, *Terry* suspicion, and probable cause).

Moreover, assuming *arguendo* that probable cause for eluding ever existed, it disappeared when Lt. Nazario explained his motivations to the officers which they agreed were reasonable and happened all the time. It disappeared when Lt. Nazario stopped his vehicle, rolled down the window, and attempted to calmly engage the officers—that is, before the officers unduly prolonged the traffic stop, applied force, or attempted to deter Lt. Nazario from complaining in the future about the traffic stop. Probable cause can disappear when facts and information reasonably knowable to an officer change. *See, Sevingy v. Dicksey,* 846 F.2d 953, 957 n.5 (4th Cir. 1988) (*citing BeVier v. Hucal*, 806 F.2d 123, 127 (7th Cir. 1986)) (officers must be held to knowledge of reasonably discoverable information bearing upon probable cause to

---

[7] The COVID extensions for Virginia DMV registrations, although having expired roughly a month prior, also would have factored into the weight a reasonable officer, being aware of this information as were the Windsor Police Officers would have given this "hunch" that the vehicle was stolen and not simply improperly displaying or missing places due to, *inter alia*, the COVID 19 DMV extensions.

[8] Although *Wingate* was decided in 2021 it was dealing with the law clearly established as it existed in 2017. *Wingate*, 987 F.3d at 303.

arrest); *Parham v. Commonwealth*, 2005 Va. App. LEXIS 581 at *14-15, No. 1544-04-2 (Va. Ct. App. 2005) (*Terry*-style suspicion disappears based on changed circumstances and new information).

Thus, the District Court erred in ruling, under the facts and circumstances of this case, that Gutierrez and Crocker had probable cause to believe Lt. Nazario was eluding them in violation of Virginia Code § 46.2-817.

The District Court relied on *Manners v. Canella*, 891 F.3d 959, 965 (11th Cir. 2018) and *Kowalczuk v. Giese* No. 19-cv-1230 2021 WL 1192412 at *1 (E.D. Wis. Mar. 30, 2021) to conclude the officers had probable cause for eluding. **JA768.** The cases are factually and legally distinguishable.

In *Manners*, a Florida case, the driver was fearful of police brutality and waited to pull over until reaching a gas station that was well-lighted and would have a camera. The *Manners* court ruled that the officers had probable cause to believe the driver had committed the offense of fleeing. But Florida's *fleeing* statute requires only a *willful* refusal to stop, *Manners*, 981 F.3d at 970, whereas Virginia's *eluding* statute requires a willful *and wanton* refusal to stop—i.e., disregard for the safety of others. Va. Code § 46.2-817. This additional wanton element of the Virginia code makes the two cases incomparable when Lt. Nazario did not disregard the safety of others (he slowed upon the signal, drove below the speed limit, and used his turn signals while looking for a safe place to stop) and his search for a well-lighted and

safe place to stop (which happens to law enforcement all the time) was justified, that is for his and officer safety.

The District Court interpreted *Kowalczuk*, an unpublished Wisconsin district court opinion, as indicating that driving to a well-lighted area instead of immediately stopping could be considered "active resistance." **JA768.** But in *Kowalczuk* the "active resistance" was a combination of (1) not immediately pulling over, (2) resisting the officer while on the ground, (3) getting up despite lawful commands to stay on the ground, and (4) struggling with and kicking the officer. The parties in that case did not contest that this was active resistance. *Kowalczuk*, 2021 U.S. Dist. LEXIS 60753 at * 14. This Wisconsin district court case is too dissimilar to be used as an appropriate guide.

Therefore, the District Court erred when it determined the officers had probable cause to arrest Lt. Nazario for eluding.

## B.    OBSTRUCTION OF JUSTICE

Under Virginia law,

If any person **without just cause** knowingly obstructs . . . any law-enforcement officer . . . in the performance of his duties as such or fails or refuses **without just cause** to cease such obstruction when requested to do so by such . . . law enforcement officer . . . is guilty of a class 1 misdemeanor.

Va. Code. 18.2-460(A) (Obstruction of Justice) (emphasis added).

26

Merely rendering a law enforcement officer's job more difficult is not obstruction of justice.  When, as here, there are no threats to the officer, obstruction requires actual force, direct action, or opposition without just cause.  *Wilson v. Kittoe*, 337 F.3d 392, 402-03 (4th Cir. 2003); *Rogers v. Pendleton*, 249 F.3d 279, 291 (4th Cir. 2001); *Jones v. Commonwealth*, 141 Va. 471, 478, 126 S.E. 74, 76 (Va. S. Ct. 1925); *Ruckman v. Commonwealth*, 28 Va. App. 428, 429, 505 S.E.2d 388, 389 (Va. Ct. App. 1988); *Brown v. City of Danville*, 44 Va. App. 586, 597, 606 S.E.2d 523, 529 (Va. Ct. App. 2004).

Self-defensive reactions to an officer's surprising escalation of force do not constitute obstruction of justice.  *E.g. Smith v. Ray*, 781 F.3d 95, 98, 102-03 (4th Cir. 2015); *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994); *Cromartie v. Billings*, 298 Va. 284, 305-06, 837 S.E.2d 247, 258-59 (Va. Sup. Ct. 2020).

No reasonable officer would have believed that Lt. Nazario obstructed justice. These officers confronted a citizen who had slowed his vehicle in response to emergency lights and stopped his vehicle in a well-lighted area for the safety of all parties, which they admitted was reasonable and happened all the time, especially with minorities.  They confronted him by brandishing and continuing to train their firearms on him—a non-contact use of force that can be excessive and unconstitutional.  *E.g. Bellote v. Edwards*, 629 F.3d 415, 424 (4th Cir. 2011), After exiting his vehicle Crocker continued his initial escalation of the situation. Despite

27

knowing that he could not tell, from his vantage point, whether Lt. Nazario had or had not complied, he proceeded as if Lt. Nazario had not complied and told Gutierrez he had not complied. This was unreasonable. *Franklin*, *v. City of Charlotte*, 64 F.4th 519, 533(4th Cir. 2023).[9] Any escalation of force based on this unreasonable assumption was likewise unreasonable, *see, id.,* and provided Lt. Nazario with substantial just cause to refuse under the obstruction statute. That Crocker reported to Gutierrez erroneously that Lt. Nazario was not complying does not change Lt. Nazario's justification or the fact that there was no probable cause. Contrary to Crocker's statements, Gutierrez could see from his vantage point that Lt. Nazario had complied, so far as compliance was possible, **Video CN-3 at 18:37:02 to 18:38:02, Video CN-1 at 0:06 to 0:50**, yet he refused to de-escalate the situation. Instead, he escalated it even further—thus reinforcing Lt. Nazario's just cause.

The officers issued mutually inconsistent commands to Lt. Nazario to both keep his hands outside of the vehicle and to exit his vehicle. An officer, under these circumstances, could reasonably foresee that the driver's seatbelt—let alone the lock on the door—would preclude simultaneous compliance with these commands. A reasonable officer would have understood these inconsistent commands shouted down the barrels of firearms placed Lt. Nazario in a potentially lethal Catch-22:

---

[9] Although *Franklin* was decided in 2022, it was dealing with clearly established law as it existed in March, 2019. *Franklin*, 64 F. 4th at 525.

28

Obey and risk death. Or disobey and risk death.  If he obeyed the first commands to keep his hands out the window so the officers could see them and know he was not a threat, he would be ignoring their second order.  If he complied with the second order and reached into the vehicle to unlock his door and take off his seatbelt, he would be violating the first command and risk getting shot when his hands disappeared into the vehicle.[10]  This too factors into Lt. Nazario's just cause, as reasonable officers understand the common-sense ramifications of their orders. *Franklin*, 64 F.4th at 533, 535, 539 (denying qualified immunity where, almost identically to this case, officers rushed headlong into a scene that had subsided, established no dialogue, shouted at the suspect, and in their zeal to disarm and arrest the suspect did not realize that their inconsistent commands defied reality).

Despite Lt. Nazario's compliance with their orders by turning off his vehicle, displaying his hands, and calmly answering their questions, Gutierrez told Lt. Nazario he was about to "ride the lightning"—a death threat. Gutierrez then said Lt. Nazario should be afraid to exit the vehicle, (that is to follow one of their two inconsistent commands) and then OC sprayed him, beat him, and threw him on the ground while Crocker initially failed to intervene to stop Gutierrez's behavior, and

---

[10] Lt. Nazaro chose to adhere to the command to keep his hands outside of the vehicle, and not the commands to exit the vehicle because he felt it was the safer option, and that if he put his hands back in the vehicle to unlock and open the door, he would be shot.  **JA320.**

later joined Gutierrez by jumping on Lt. Nazario to force him to the pavement and handcuff him. **Video CN-4 at 18:37:26 to 18:42:24**.

Under these circumstances, a reasonable officer would have understood that Lt. Nazario's refusal was not an attempt to obstruct the officers in the performance of their duties. Rather, this reasonable officer would have understood that Lt. Nazario had just cause, in self-defense, for his actions due to their officers' surprising, unjustified, and unreasonable actions, escalation, and force. *See, e.g., Smith*, 781 F.3d at 98, 102-03; *Rowland*, 41 F.3d at 174; *Cromartie*, 298 Va. at 305-06. Thus, the District Court erred in determining that Gutierrez and Crocker had probable cause to believe that Lt. Nazario had obstructed justice.

To support its holding, the District Court relied on *Coffee v. Morris*, 401 F. Supp. 2d 542, 547 (W.D. Va. 2005), and *Collins v. Commonwealth*, No. 2080-06-02, 2007 WL 4523117, at *2 (Va. Ct. App. Dec. 27, 2007). **JA769**. These cases are far too dissimilar to provide meaningful guidance. Neither case involved officers behaving like Gutierrez and Crocker. Neither case involved mutually inconsistent and conflicting commands, the refusal to calmly engage with the subject, the failure to tell the subject *why* he was being detained, death threats, confirmation that the subject should be afraid to follow their commands, or the use of force by the law enforcement officers to the obscene level that Crocker and Gutierrez used.

30

In *Coffee*, the officer stopped and approached the vehicle, told the driver that he was going to receive a summons for speeding, and asked the driver and the passenger to stay in the vehicle. When the passenger exited the vehicle, the officer issued a citation for obstruction.[11] *Coffee*, 401 F. Supp 2d, at 543, 547. The officers did not behave like Gutierrez or Crocker.

Likewise, in *Collins*, there is no evidence that the officer in question behaved like Gutierrez and Crocker. Rather, the opinion demonstrates the contrary. The officer engaged the suspect, told her *why* she had been pulled over, and asked for her license and registration. *Collins*, 2007 Va. App. LEXIS 468 at *2-3. The suspect refused to sign the summons even after the officer explained its purpose, that it was not an admission of guilt, and gave her several warnings that she would be arrested if she did not sign. *Id* at 2. She did not sigh, resisted exiting her vehicle, and actively resisted her arrest.[12] *Id* at 3-6. Thus, *Collins* is very different than the traffic stop at issue here; the officer's behavior in *Collins* is almost the exact opposite of Gutierrez's and Crocker's behavior, and the behavior of the suspect almost completely opposite that of Lt. Nazario.

---

[11] In *Coffee*, the court stated in a footnote that in retrospect it was clear that Ms. Coffee had *not* committed obstruction of justice. *Coffee*, 401 F. Supp 2d at 548, n. 3.

[12] Of note, the District Court ruled that by the time the Gutierrez and Crocker applied force to Lt. Nazario, he was ***not*** actively resisting. **JA781.**

However, *Cromartie v. Billings*, *Smith v. Ray*, and *Rowland v. Perry* provide a far different and more appropriate perspective. They show that when a citizen faces sudden, unexpected, and unnecessary violence from law enforcement, no reasonable officer would interpret self-defensive actions as unjustified or obstruction. *See Cromartie*, 298 Va. at 305-06; *Smith*, 781 F.3d at 102-103; *Rowland*, 41 F.3d at 174.

Thus, it was error for the District Court to rely on *Collins* or *Coffee* and to hold that the officers had probable cause to believe that Lt. Nazario's behavior constituted obstruction. That is, it was error for the District Court to determine that a reasonable officer, having acted or witnessed another officer act like Gutierrez and Crocker, would have believed that Lt. Nazario's transparent, nonthreatening refusal to comply with their command to exit the vehicle was obstruction of justice. It was error for the District Court to determine that a reasonable officer would believe that after being blinded and incapacitated by the OC spray, threatened with death, and told to be afraid to exit the vehicle, Lt. Nazario's failure to immediately get on the ground after exiting the vehicle (a delay of seconds) constituted obstruction. It was error for the District Court to determine that a reasonable officer would have believed that Lt. Nazario's hesitancy to lay down once out of the vehicle and subjected to knee strikes and further threats was obstruction. It was error for the District Court to determine that under these circumstances, a reasonable officer

would believe that any or all of Lt. Nazario's actions would have constituted obstruction.  Even if probable cause is a low bar, the bar is not and cannot be set this low.

Rather, a reasonable officer would have understood that they had taken a situation where there obviously was no need for the use of any significant force, and deployed an unreasonably aggressive tact which quickly escalated it to a (one-sided) violent exchange when the citizen instinctively tried to defend himself using the least amount of force possible: just staying put.  A reasonable officer would have realized there was no obstruction and that Lt. Nazario was justified.  *Smith*, 781 F.3d at 104; *see also Franklin*, 64 F.4th at 525.

### C.     FAILURE TO OBEY – VIRGINIA CODE § 18.2-464.

Under Virginia law,

> [i]f any person, being required by a conservator of the peace on view of the breach of the peace or other offense to bring before him the offender, refuse or neglect to obey the conservator of the peace, he shall be guilty of a Class 2 misdemeanor."

Va. Code § 18.2-464.

Initially, the District Court erred in even considering this claim because, at no time *prior* to litigation did either officer allege that they had probable cause to believe Lt. Nazario violated Virginia Code § 18.2-464.  This was a patently *post hoc* attempt to justify their behavior.  *Cf. United States v. Graham*, 686 Fed. Appx. 166,

174 (4th Cir. 2017) (probable cause developed after the fact cannot cure a prior constitutional violation).

Furthermore, by plain statutory language, no reasonable, prudently cautious, and well-trained officer would believe it was more likely than not that Lt. Nazario committed this violation.  Virginia Code § 18.2-464 criminalizes the following conduct: refusing to bring an offender to a conservator of the peace (a) after a conservator of the peace, on a view of the breach of the peace or other offense, (b) orders a person to bring the offender to him and (c) such person refuses.

Assuming *arguendo* that the person *being ordered* can be identical with *the offender*, Gutierrez and Crocker saw no breach of the peace or other offense (apart from their own)—just a traffic violation for an improperly displayed license plate. Further, and more importantly, the person (that is, Lt. Nazario) brought the offender (that is, Lt. Nazario) to Gutierrez and Crocker.  Lt. Nazario slowed down, looked for a safe well-lighted place, signaled, pulled over at the gas station, stopped his vehicle, placed it in park, turned it off, and placed his hands outside the vehicle in compliance with the officers' implied and express commands.  The only thing that Lt. Nazario did not do was exit his vehicle and lay down.  As discussed at length above, such failure was legally justified.  Therefore, the Court erred in determining that the officers had probable cause to believe that Lt. Nazario violated Virginia Code § 18.2-464.

**D.     THE ERROR IS REVERSIBLE**

The District Court's probable cause determination is reversible error as it informed the Court's qualified immunity analysis, **JA767**, **JA771**, **JA780**, shaped the jury instructions, **JA895-897**, and limited the legal theories Lt. Nazario and his expert could rely upon in his state common law claims, **JA826**. The District Court discussed its probable cause rulings with the jury, **JA859-862**, and the officers' counsel discussed it with the jury during closing arguments, **JA866-867**. Thus, the determination likely factored into the jury verdict making the error reversable.

**II.    The District Court Erred in Determining that Gutierrez and Crocker Were Entitled to Qualified Immunity for Counts I, II, and IV and Dismissing them on Summary Judgment.[13]**

**STANDARD OF REVIEW**
**QUALIFIED IMMUNITY ON SUMMARY JUDGMENT**

This Court reviews granting qualified immunity on summary judgment *de novo*. *Young v. Equinor USA Onshore Props., Inc.*, 982 F.3d 201, 205 (4th Cir. 2020). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Ordinarily, when a district court's grant of

---

[13] The jury's ruling in favor of Crocker on the state law assault and battery claims and in favor of Gutierrez for the state law battery (but not assault) claim should not factor into this Court's analysis of the district court's ruling on qualified immunity. This is because, as discussed in parts I, *infra*, and III, *supra*, there is a reasonable probability that the Court's probable cause determinations influenced the jury and their ultimate verdict, making the verdict inappropriate to consider.

summary judgment disposes of cross-motions for summary judgment, this Court considers each motion separately on its own merits, resolving all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion. *Wingate*, 987 F.3d at 304. However, when the parties tell two different stories, one of which is blatantly contradicted by the video evidence, or record, so that no reasonable juror could believe it, a court should not adopt that version of the facts, but the video or record's version, for purposes of reviewing or ruling on summary judgment. *Scott*, 550 U.S. at 379-81.

## ANALYSIS

### A.    COUNT II – EXCESSIVE FORCE

All excessive force constitutional claims, regardless of the manner or tools employed, are analyzed using the factors set forth in *Graham v. Connor*, 490 U.S. 386, 397 (1989). *E.g. Estate of Armstrong v. Village of Pinehurst*, 810 F.3d 892, 909-10 (4th Cir. 2016). If the *Graham* factors strongly favor the plaintiff, the defendants are not entitled to qualified immunity. *E.g. Smith*, 781 F. 3d at 102; *Rowland*, 41 F.3d, 167, 174 (4th Cir. 1994).

The District Court's probable cause determination tainted its qualified immunity rulings regarding whether Gutierrez and Crocker's force was excessive

under *Graham*.[14]  **JA767, JA780**.   When viewed correctly—that is, with the erroneous probable cause determination removed from the analysis—the *Graham* factors so heavily favor Lt. Nazario that the Court should have *at least* denied the officers qualified immunity, if not also granting judgment as to liability against the officers for unreasonable and excessive force.

In discussing the first *Graham* factor, the severity of the crime at issue (when judged from the actions and not the title of the offense), *see Smith*, 781 F.3d at 101, the District Court said the factor weighs "in favor" of the Plaintiff, **JA780**, but argues, seemingly, that the probable cause for eluding, obstruction, and failure to obey reduce that weight.  **JA780**.  Under a correct probable cause analysis, the *only* offense either officer had probable cause to believe Lt. Nazario committed was an improperly displayed license plate.  This is not a crime at all, but a traffic offense that is so minor a judge can dismiss the summons upon proof of compliance.  Va.

---

[14] To the extent that this matter was "tense, uncertain, and rapidly evolving," that had nothing to do with Lt. Nazario's behavior, rather the conduct of Crocker and Gutierrez.  This is not the sort of police conduct that *Graham* (or qualified immunity) was designed to protect.  It was not a bad guess in a grey area in a tense, uncertain, and rapidly evolving situation.  Lt. Nazario was calm and compliant, the officers however were not.  *See also Brown v. City of Golden Valley,* 574 F.3d 491 (8th Cir. 2009) (denying qualified immunity where officer tased woman who refused to leave car during a traffic stop); *Park v. Shiflett,* 250 F.3d 843 (4th Cir. 2001) (denying qualified immunity to officers who pepper sprayed an unarmed, detained woman); *Dent v. Montgomery County Police Dept.,* 745 F. Supp. 2d 648 (D. Md. 2010) (denying qualified immunity to officers who beat and tased an arrestee); *Henry v. Purnell,* 652 F.3d 524 (2011) (denying qualified immunity where officer shot fleeing plaintiff whom officers "had no reason to believe was a threat").

Code § 46.2-715 and -716(D).  The officers lacked probable cause to believe that Lt. Nazario had committed *any* crime.  Thus, the first *Graham* factor not only favored Lt. Nazario (as the District Court states, **JA780**), but it strongly favored Lt Nazario.  *E.g. Estate of Armstrong*, 810 F.3d at 899-900 ("When the subject of a seizure has not committed any crime, this [first] factor weighs heavily in the [plaintiff's] favor.")

Turning to the second *Graham* factor, whether Lt. Nazario posed an immediate threat to the officers or others, *Smith*, 781 F.3d at 101, the District Court found the factor "can favor either party" because Lt. Nazario's eluding may have led a reasonable officer to believe he was dangerous.[15]  However, when probable cause for eluding (or obstruction, or failure to obey) is stripped away, Lt. Nazario's failure to immediately pull over while in uniform would not have led a reasonable officer to believe he was armed or dangerous, or posed an immediate threat to the officers or anyone else.  There was nothing in Lt. Nazario's reaction to the officers behavior that was either furtive or menacing; Lt. Nazario kept his hands visible, spoke calmly,

---

[15] The District Court also argued that Lt. Nazario being in uniform (but not presenting a firearm) in combination with his eluding, also may have led an officer reasonably to believe he was armed and dangerous. **JA781**.  However, being armed is a constitutional right.  It does not alone support a reasonable conclusion that the Lt. Nazario was *a danger* to justify use of force.  *See Housley v. Holquist*, 879 F. Supp. 2d. 472, 481 (D. Md., 2011) (qualified immunity denied where officers placed plaintiff in a chokehold, pepper sprayed, tased, and shot him in the left shoulder because, although the Plaintiff admitted to the officers he was armed, he presented himself to the officers in a peaceful, non-threatening manner.); *cf. Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013); *Betton v. Bleue*, 942 F.3d 184, 192 (4th Cir. 2019).

and all he asked for was a simple explanation. *E.g., Franklin*, 64 F.4th at 532-33 (discussing the second *Graham* factor).  Further, the first *Graham* factor strongly favored Lt. Nazario, reinforcing that the second does, too.  *See Estate of Armstrong*, 804 F.3d at 900 (the first *Graham* factor is intended as a proxy for determining whether an officer had any reason to believe that the subject was a potentially dangerous individual, the second *Graham* factor).  Thus, this second factor strongly favors Lt. Nazario.  He had not committed any crime, nor did he pose any immediate threat to the safety of the officers, or anyone else.

The District Court determined that the third *Graham* factor, whether the subject is actively resisting arrest or attempting to evade arrest by flight, *Smith*, 781 F.3d at 101, only *slightly* favored Lt. Nazario due to the passive nature of his resistance[16] in the face of what the Court deemed to be a lawful order to exit the vehicle[17].  **JA781-782**.  However, given the officers lack of probable cause to believe Lt. Nazario had committed *any* crime, and their use of force, threats, *immediate* escalation based on an unreasonable assumption, willful ignorance of the facts before their eyes, and mutually inconsistent commands, a reasonable officer would

---

[16] The District Court correctly noted that by the time that Lt. Nazario refused the lawful order to exit the vehicle he was not actively fleeing and did not engage in active resistance.  **JA781**.

[17] The District Court does discuss whether Lt. Nazario was justified in failing to comply with that order in its analysis.

have realized that Lt. Nazario's refusal to exit the vehicle was a *lawful* and justified refusal, not a threat to their safety or the safety of others.  Even in the context of a *lawful* arrest, a citizen has the right to resist with reasonable force an officer's unreasonable use of force.  *See, e.g., McCracken v. Commonwealth,* 39 Va. App. 254, 262, 572 S.E.3d 493, 497 (Va. Ct. App. 2002); *Palmer v. Commonwealth*, 143 Va 592, 602-03, 130 S.E. 398, 401 (1925); *Foote v. Commonwealth*, 11 Va. App. 61, 66, 396 S.W.2d 851, 856 (1990); *Gnadt v. Commonwealth*, 27 Va. App. 148, 151, 497 S.E. 2d 887, 888 (1998).

Because of the District Court's probable cause ruling, its analysis of the third *Graham* factor erroneously disregards Lt. Nazario's right to refuse to exit the vehicle as justified resistance to Gutierrez's and Crocker's unlawful use of force.  Lt. Nazario was *justified* in resisting the order to exit the vehicle, and a reasonable officer would have realized the same, making the wholly passive resistance commendable.  Lt. Nazario was not attempting to resist the arrest, but he was passively resisting the force.  When the District Court's erroneous probable cause determination is corrected, the third *Graham* factor *strongly* favors Lt. Nazario and is very unfavorable to Crocker and Gutierrez.  *See Estate of Armstrong*, 810 F.3d at 905 (*citing Park v. Shiflett*, 250 F.3d 843, 848-49, 852 (4th Cir. 2001)) (using OC spray can be excessive under the *Graham* factors).

Admittedly, *unjustified* non-compliance with *lawful* orders may justify *some* use of force, but the level of justified force varies based on the risk posed by the resistance. *Estate of Armstrong,* 810 F.3d at 901. Even were Lt. Nazario's refusal not justified, the force was still objectively unreasonable given the circumstances surrounding the incident and the risk posed by his refusal.

Therefore, when stripped of the erroneous probable cause analysis, the three major *Graham* factors so strongly favor Lt. Nazario that the District Court erred in ruling that either Gutierrez or Crocker were entitled to qualified immunity regarding their use of force. It erred in dismissing Count II based on this qualified immunity determination, and it further erred in refusing to grant Lt. Nazario liability against Gutierrez and Crocker under the *Graham* factors for excessive force on summary judgment.

## B.    COUNT IV – FIRST AMENDMENT RETALIATION

The District Court, relying on the standard set forth in *Nieves v. Bartlett* 139 S. Ct. 1715, 1728 (2019), that probable cause[18] defeats a First Amendment retaliation claim, granted Gutierrez and Crocker qualified immunity and dismissed Count IV.[19]

---

[18] The District Court made no mention of the "Assault on a Law Enforcement" allegations in its summary judgment opinion.

[19] Threats made to deter protected First Amendment speech are analyzed under like any other First Amendment retaliatory arrest claim. *See, e.g., Lozman v. City of Rivera Beach*, 138 S. Ct. 1945 (2018); *Nazario v. Gutierrez*, 2020 U.S. Dist. LEXIS 19530 at * 17-18 (E.D. Va. February 2, 2022).

**JA796.** However, as Crocker and Gutierrez *lacked* probable cause, *Neives* is not applicable. Rather the *Hartman v. Moore,* 547 U.S. 250 (2006) line of cases controls. As the District Court quoted from *Hartman,* "Demonstrating that there was no probable cause for the underlying criminal charge will tend to reinforce the retaliation evidence and show that retaliation was the but-for basis for instigating the prosecution." **JA796**. Thus, as there was no probable cause, the District Court erred in granting Gutierrez and Crocker qualified immunity for and dismissing Count IV, and not granting Lt. Nazario judgment as to Crocker's and Gutierrez's liability.

### C.    COUNT I – UNREASONABLE SEIZURE

Because Gutierrez and Crocker lacked probable cause to believe that Lt. Nazario committed any crime, their force—that is, brandishing firearms, the escalations, issuing threats, deploying OC spray, delivering knee strikes, throwing Lt. Nazario on the ground on his face, and using handcuffs—was objectively unreasonable.

In granting qualified immunity on the illegal seizure claim for prolonging the traffic stop via the use of force, the District Court held that Lt. Nazario made out a constitutional violation by alleging the conflicting orders, aiming firearms at him, and threats by Gutierrez unreasonably prolonged the traffic stop.[20] But the Court

---

[20] The District Court did not address the OC spray, its effects, the prolonged delay it caused, or the handcuffing and knee strikes in this analysis, **JA776-777**,

held that the contours of that right was not clearly established because there were no Fourth Circuit or Supreme Court decisions that would put an officer on notice that conflicting instructions, aiming of firearms, or threats that unreasonably prolong a stop violates a person's clearly established Constitutional rights. **JA776-777**.

Initially, the District Court erred in determining that since this *particular mode* of prolonging the traffic stop had not been previously adjudicated the right was not clearly established for qualified immunity purposes.  This makes the analysis far too granular and would permit an officer to circumvent liability for an unreasonably prolonged traffic stop by coming up with *novel* and unadjudicated ways to extend the same, such as playing Sudoku, dancing in the streets, telling jokes to bystanders, or going to Walmart.  All that should be required under this analysis is whether the officer took actions not reasonably related to the purpose of the traffic stop, that unreasonably prolonged the traffic stop. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, and attend to related safety concerns).

However, and as discussed above, when the probable cause ruling is corrected, the force was objectively unreasonable.  Thus, the *correct* question to ask was

---

notwithstanding it recognizes these were part of the Lt. Nazario's claims for unnecessarily prolonging the traffic stop. **JA769-770**.  This was an error which alone supports reversal.

whether the law was sufficiently established to put Gutierrez and Crocker on notice that when constitutionally excessive and unreasonable force (as well as the other unconscionable actions) prolongs a traffic stop, that prolongation is unreasonable and violative of a person's clearly established Constitutional rights. *Illinois v. Caballes,* 543 U.S. 405, 407 (2005); *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017); and *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015) precedents, the precedents they quote, and their progeny provide such clearly established law.  Further, the illegality of the prolonged detention that excessive force causes is manifestly included within more general applications of the core constitutional principle invoked.  *Sims v. Labowitz*, 885 F.3d 254, 263 (4th Cir. 2018) (citing *Clem v. Corbeau*, 284 F.3d 543, 553 (4th Cir. 2002).  If the force is unreasonable, and that force prolongs a traffic stop, then the prolongation is unreasonable; after all courts need not—and should not—assume that government officials are incapable of drawing logical inferences, reasoning by analogy, or exercising common sense.  In some cases (like this case), officers can be expected to know that if X is illegal, then Y is also illegal, despite factual differences between the two. *Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019).

Thus, the District Court erred in granting qualified immunity to Gutierrez and Crocker as to and dismissing Count I (Lt. Nazario's unreasonable seizure claim) on

summary judgment and not granting Lt. Nazario liability against Crocker and Gutierrez.

## III.  THE DISTRICT COURT ERRED IN GIVING INSTRUCTION NUMBERS 26 AND 27-A.

### STANDARD OF REVIEW – JURY INSTRUCTION ERROR

Because Lt. Nazario properly objected to jury instruction numbers 26 and 27-A based on the underlying probable cause ruling, **JA856-858**, this Court reviews de novo whether Instructions 26 and 27-A correctly stated the law.  *E.g. United States v. Campbell*, 850 F. App'x 178, 179 (4th Cir. 2021); *United States v. Hassler*, 992 F.3d 243, 246 (4th Cir. 2021); *United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018).  If the instruction is erroneous, the jury verdict must be set aside if there is a reasonable probability the error affected the verdict.  *E.g. United States v. Underwood*, 845 F. App'x 239, 241 (4th Cir. 2021).

Even if the jury instruction correctly stated the law, this Court must review, for abuse of discretion, the decision to give the instruction.  *E.g. Miltier*, 882 F.3d at 89.  In this analysis, the Court evaluates whether the instructions, construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party.  *Id.*  The verdict will be set aside on this basis if the instruction seriously prejudiced the case of the party that challenged the instruction.  *Id.*

## ANALYSIS

Both the fourth paragraph of Instruction 26 and the first line of Instruction 27-A inaccurately states the controlling law because they both incorporate the erroneous probable cause determination.

The fourth paragraph of Instruction 26 reads: "I have determined that at the time that Defendant Crocker initiated the traffic stop of Caron Nazario, he had probable cause to believe that Caron Nazario…was eluding him." **JA895**.

Instruction 27-A reads: "I have determined that Defendant Crocker had probable cause to believe that Plaintiff Nazario committed obstruction of justice without force and failure to obey." **JA897**.

As argued above, the District Court ruled erroneously that Gutierrez and Crocker had probable cause to believe that Lt. Nazario had committed these crimes. These errors of law were subsequently incorporated into Instruction 26 and 27-A. This is judged de novo and it is an incorrect statement of law. Further, the District Court discussed its probable cause determinations with the jury prior to closing argument, **JA859-862**, **JA895-897**, and both sets of defense counsel made closing arguments regarding the existence of probable cause. **JA866-867.**

Thus, this incorrect statement of the existence of probable cause (and the comments and arguments based on it presented to the jury), when viewed alongside the justification and excuse factors in the jury instructions for the state common law assault and battery (**JA911-916**), and false imprisonment (**JA906-907**), demonstrate a reasonable probability that the error effected the verdict. For example, there is a

reasonable probability that the jury determined that the officers' probable cause justified or at least excused their behavior or determined that the officers' probable cause meant that Lt. Nazario was *not* justified in his refusals, leading to a defense verdict. Therefore, the verdict must be set aside, and a new trial ordered. *Underwood*, F. App'x at 241.

For these reasons, the Court should reverse the verdict and remand the case for further proceedings.

**CONCLUSION**

For these reasons, Lt. Nazario requests that this Court reverse the District Court's determination that Gutierrez and Crocker had probable cause to believe that Lt. Nazario had committed the crimes of eluding, obstruction of justice, and failure to obey; reverse the District Court's determination that Gutierrez and Crocker were entitled to qualified immunity for Counts I, II, and IV, reverse the District Court's dismissal of those counts, and enter judgment against the officers for those counts; vacate the jury's liability verdicts in favor of Crocker for Counts V (common law assault), Count VI (common law battery), and Count VII (common law false imprisonment); vacate the jury's damages award in favor of Lt. Nazario and against Crocker for Counts III (Fourth Amendment Illegal Search) and VIII (illegal search under Virginia Code § 19.2-59);[21] vacate the jury's liability verdicts in favor of Gutierrez for Count III (Fourth Amendment illegal search), Count VI (common law

---

[21] Lt. Nazario does *not* request that this Court reverse the District Court's determination that Crocker is liable to Lt. Nazario for these counts.

battery), Count VII (common law false imprisonment), and Count VIII (illegal search under Virginia Code § 19.2-59), as well as the jury's damage award in favor of Lt. Nazario and against Gutierrez for Count V (common law assault);[22] award Lt. Nazario his costs and attorney fees; remand the case for further proceedings consistent with this Court's ruling; and all other further and additional relief as the Court deems appropriate.

**REQUEST FOR ORAL ARGUMENT**

Lt. Nazario requests the opportunity for his counsel to present oral arguments in support of this appeal.  Oral arguments will likely aid the Court, or a panel of the Court, in understanding and addressing the issues.

October 2, 2023

**Respectfully submitted,**

**CARON NAZARIO**

By:  /s/ Jonathan M. Arthur, Esq.
Jonathan M. Arthur, Esq. (VSB 86323)
j.arthur@robertslaw.org
THOMAS H. ROBERTS & ASSOCIATES, P.C.
105 South 1st Street
Richmond, Virginia 23219
Firm: 804-783-2000
Fax: 804-783-2105
Direct: 908-991-4308
*Counsel for Caron Nazario*

---

[22] Lt. Nazario does *not* request that this court reverse the jury's determination that Gutierrez is liable to Lt. Nazario for common law assault.

## CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

This document contains <u>11,744</u> words.

2.    This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Times New Roman.


By: <u>/s/ Jonathan M. Arthur, Esq.</u>
Jonathan M. Arthur, Esq. (VSB 86323)
j.arthur@robertslaw.org
THOMAS H. ROBERTS & ASSOCIATES, P.C.
105 South 1st Street
Richmond, Virginia 23219
Firm: 804-783-2000
Fax: 804-783-2105
Direct: 804-991-4308
*Counsel for Caron Nazario*


October 2, 2023