**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 23-1620**

CARON NAZARIO,

Plaintiff – Appellant,

v.

JOE GUTIERREZ, In his Personal Capacity; DANIEL CROCKER, In his Personal
Capacity,

Defendants – Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at
Norfolk.  Roderick Charles Young, District Judge.  (2:21-cv-00169-RCY-LRL)

Argued:  March 19, 2024                    Decided:  May 31, 2024

Before KING, THACKER, and RUSHING, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion.  Judge King wrote
the majority opinion, in which Judge Thacker joined.  Judge Rushing wrote an opinion
dissenting in part and concurring in part.

**ARGUED:**  Jonathan Michael Arthur, THOMAS H. ROBERTS & ASSOCIATES, P.C.,
Richmond, Virginia, for Appellant.  Anne Catherine Lahren, PENDER & COWARD,
Virginia Beach, Virginia; Jessica Ann Swauger, HANCOCK, DANIEL & JOHNSON,
P.C., Glen Allen, Virginia, for Appellee.  **ON BRIEF:**  John B. Mumford, Jr., Sandra M.
Douglas, HANCOCK, DANIEL & JOHNSON, P.C., Glen Allen, Virginia, for Appellee

Joe Gutierrez.  Bryan S. Peeples, Richard H. Matthews, Robert L. Samuel, Jr., PENDER & COWARD, Virginia Beach, Virginia, for Appellee Daniel Crocker.

KING, Circuit Judge:

Plaintiff Caron Nazario appeals from the judgment entered following a January 2023 jury trial in the Eastern District of Virginia on his claims of mistreatment by defendant police officers Joe Gutierrez and Daniel Crocker (the "Policemen"). Nazario, an Army officer in Virginia, argues that the district court erred in ruling that the Policemen had probable cause to arrest Nazario for three Virginia misdemeanor offenses.[1] That error, Lt. Nazario contends, resulted in the court (1) incorrectly awarding the Policemen qualified immunity on three of his constitutional claims, and (2) improperly instructing the jury on probable cause. In addition to responding to Nazario's appellate contentions, the Policemen contend that Nazario's appeal is procedurally barred.

To resolve this appeal, four issues must be addressed and resolved: (1) whether Lt. Nazario is procedurally barred from pursuing his appeal; (2) whether the district court erred on three of its probable cause determinations; (3) whether the court erred in awarding qualified immunity to the Policemen on three of Nazario's constitutional claims; and (4) whether the court committed reversible error in its jury instructions. As explained herein, we affirm most of the judgment, but reverse the court's award of qualified immunity to defendant Gutierrez on Nazario's Fourth Amendment claim for an unreasonable seizure. We therefore affirm in part, reverse in part, and remand for further proceedings.

---

[1] At the time of the events underlying this appeal, Lt. Nazario was a Second Lieutenant in the United States Army Medical Corps. He is of Latinx and African American descent. During the pendency of this litigation, he was promoted to First Lieutenant.

3

I.

We begin by summarizing the facts pertinent to Lt. Nazario's various claims. Because Nazario is challenging an adverse award of summary judgment, the facts, including the reasonable inferences to be drawn therefrom, are recited in a light most favorable to Nazario. *See Aleman v. City of Charlotte*, 80 F.4th 264, 270 n.1 (4th Cir. 2023).

A.

1.

On the evening of December 5, 2020, Lt. Nazario was travelling westbound on U.S. Route 460, through the Town of Windsor, Virginia. The Town has a police department — the Windsor Police Department — which has existed for 20 years and is an unaccredited police agency. Early that evening, at about 6:30, and after dark, Nazario was driving a black 2020 Chevrolet Tahoe, which he had begun leasing approximately three months earlier. The dealership that was leasing the vehicle to Nazario had affixed a temporary license plate inside the vehicle's tinted rear window, in its upper right corner.

As Lt. Nazario drove through Windsor, defendant Crocker of the Windsor Police Department was sitting beside Route 460 in his patrol car. And at the time, Crocker was finishing a period of field training, under the supervision of defendant Gutierrez. As Nazario drove by, Crocker could not see a rear license plate being displayed, due not only to the tinted windows but the fact that it was dark outside. And under Virginia law, a license plate "shall be attached to the front and the rear of the vehicle" and be "[i]n a

4

position to be clearly visible." *See* Va. Code Ann. §§ 46.2-715, 716. A violation of these statutory requirements, however, only constitutes a "traffic infraction," and it is not criminal in nature. *See* Va. Code Ann. § 46.2-113; § 18.2-8.

Crocker turned onto Route 460 behind Lt. Nazario, illuminated his overhead blue lights, and initiated a traffic stop. Promptly after Crocker activated his blue lights, Nazario slowed his vehicle down to approximately 22 miles per hour, well below the posted speed limit of 35 miles per hour. And Nazario continued to slow to 18 miles per hour. Gutierrez was nearby and heard Crocker discussing the stop over the police radio, so he joined Crocker in following Nazario.

Although there were other places to pull over, Lt. Nazario identified the "most well-lighted space that [he] could see" as the location to pull over and stop. *See* J.A. 320.[2] He did so because it was dark and a well-lit area would not only further police officer safety, but also his own. The first well-lit area was a BP gas station, located on the south side of Route 460, and when Nazario reached the BP station, he turned into its parking lot and parked his vehicle. From the time Crocker initiated the stop until Nazario had parked his vehicle in the BP station, approximately a minute and 40 seconds elapsed, and Nazario had travelled about a mile.

---

[2] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this matter.

2.

When Crocker stepped out of his patrol vehicle, he had decided to conduct a "felony" or "high-risk" traffic stop.  This means that Crocker immediately drew his service pistol and pointed it at Lt. Nazario's vehicle.  Crocker admits that he had not witnessed a felony offense, but only "had suspicions" that a felony was occurring because an apparently new vehicle without a rear plate may be a stolen vehicle.  *See* J.A. 440.  Crocker also believed he had to prepare for the possibility that there were other people in the vehicle, or that the driver was preparing an attempt to "assassinate" him.  *Id.* at 441.

Gutierrez also parked and stepped out of his patrol car.  Gutierrez, like Crocker, raised his service weapon and pointed it at Lt. Nazario.  In the relevant camera footage, Nazario's temporary rear license plate can be seen taped to the inside of his vehicle.  Crocker also admitted that he saw the temporary license plate when he approached Nazario's vehicle.

When Crocker drew his pistol, he yelled "Driver, roll the window down!"  *See* C.V.I at 18:36:12.[3]  This was the first of a string of commands — some contradictory with one another — given by the Policemen and it was the beginning of an extended verbal exchange.  Crocker commanded Lt. Nazario to place his hands outside the window, and after approximately 10 seconds, Nazario's clasped hands can be seen out of the window.

---

[3] Citations herein to "C.V.I ___" refer to the contents of the first body-worn camera footage of Crocker submitted by the parties.

Nazario then asks a question he oft-repeats during the exchange — "What is going on?" *Id.* at 18:36:32.

Instead of answering the question, Crocker yelled for Lt. Nazario to both turn off the vehicle and put his hands outside the window. Within fifteen seconds, Nazario has complied with both those commands. Crocker then asks Nazario how many people are in the vehicle, and Nazario responds that it is just him. Nazario again asks Crocker and Gutierrez "What is going on?" and "Why are your weapons drawn?" *See* C.V.I at 18:37:00-05. Neither of the Policemen responded. Rather, Crocker begins commanding Nazario to open the car door and exit the vehicle.

To exit the vehicle, Lt. Nazario first needed to bring his hands back inside the vehicle because he was wearing his seatbelt and his driver-side door was locked. Nazario kept his hands raised, sticking them outside the driver-side window, while continuing to calmly ask "What is going on?" *See* C.V.I at 18:37:17. Again, no answer is provided by the Policemen. At this point, Gutierrez joined in with Crocker's shouting. First, Gutierrez commands Nazario to get out of the vehicle, only to yell a few seconds later that Nazario is to keep his hands outside the window. Crocker offers similarly inconsistent commands. Both Policemen are still aiming their semiautomatic service pistols at Nazario.

At this point, the Policemen have stepped aside from their patrol vehicles and are now walking toward Lt. Nazario's vehicle. They continue with their commands, while Nazario continues with his questions. Nazario also continues to keep his hands outside of his window, and asks "I am serving this country, and this is how you are treating me?" *See* C.V.I at 18:37:43-45. At this distance, the Policemen could see that Nazario was in his

7

camouflage battledress Army uniform.   Gutierrez replies that he is a veteran and he "know[s] to obey." *Id.* at 18:37:47.

Gutierrez continued to order Lt. Nazario to get out of the vehicle.  Nazario has kept his hands raised and is still asking "What is going on?"  *See* C.V.I at 18:37:54.  Gutierrez then replied "What is going on is you are fixing to ride the lightning, son." *Id.* at 18:37:55-56.  Both of the Policemen continue to walk closer to Nazario's vehicle, getting closer to the driver-side window.  Crocker keeps his gun drawn.  Gutierrez switches to a taser.

The Policemen continued to command Lt. Nazario to get out of the vehicle, while also ignoring Nazario's question about the purpose of the traffic stop.  With his hands raised, Nazario tells the Policemen that he is "honestly afraid to get out."  *See* C.V.I at 18:38:14-17.  Before Nazario can explain why he is afraid, Gutierrez interrupts him by stating, "Yeah, you should be." *Id.* at 18:38:17-19.  Gutierrez then gets close enough to Nazario's vehicle to try and open the door, but it is locked.

The Policemen continue yelling for Lt. Nazario to get out of the vehicle, and Nazario continues to ask about the purpose of the stop.  Nazario also states that he does not need to step out of the vehicle because this is only a traffic stop.  *See* C.V.I at 18:38:21-36. Gutierrez then grabs Nazario's arm.  Nazario's response is to calmly state "Get your hands off me."[4] *Id.* at 18:38:35-45.  Gutierrez releases Nazario's left arm and says that is "not a

---

[4] Crocker also argues that Lt. Nazario physically resisted Gutierrez by pulling away when Gutierrez grabbed Nazario's arm.  The video, at most, leaves an open question of whether Nazario was actually pulling his arm away from Gutierrez, as it is unclear who is controlling the movement of Nazario's arm.

problem," and takes out pepper spray and begins shaking up the container. *Id.* at 18:38:45-50. Nazario flinches and tucks his head down, while keeping his hands outside the window. Gutierrez then returns to commanding Nazario to exit his vehicle.

Crocker then comes up to the window, reaches into Lt. Nazario's vehicle, and begins attempting to unlock the vehicle's driver-side door. Nazario continues to ask about the purpose of the traffic stop and implores the Policemen to talk to him and to relax. Gutierrez continues to order Nazario out of the vehicle, and Crocker continues his effort to unlock and open the door. Nazario says "This is not how you treat a vet — I am actively serving this country, and this is how you are going to treat me?" *See* C.V.I at 18:39:00-05.

As Lt. Nazario is making those statements, the effort to open the vehicle's door is partially successful, and Crocker gets the door unlocked and begins to open it so that it is very slightly ajar. Nazario's elbow, which is still out of the window, prevents the door from being opened. Nazario, using his elbow, then pulls the door closed. Right after this occurs, Gutierrez tells Crocker to back up, and Gutierrez sprays Nazario with pepper spray. Nazario blocks some of the pepper spray with his hands, but Gutierrez then sprays three more times, hitting Nazario directly in his face. Gutierrez continues with his commands to get out of the car, and Nazario continues to keep both of his hands visible. Nazario explains that he does not want to reach into his car and unlock his seatbelt.

Eventually, Gutierrez opens the vehicle's driver-side door while Lt. Nazario keeps his hands raised. Nazario continues to express concern about reaching for his seatbelt while he is also being commanded to keep his hands raised. Gutierrez continues with his commands, and eventually Nazario explains that he is going to reach for his seatbelt. He

9

does so, unbuckles, and starts to pivot out of the vehicle, with his eyes closed due to the pepper spray.

Gutierrez orders Lt. Nazario to go "straight onto the ground," and before Nazario has his feet on the ground, Gutierrez grabs Nazario's arm. *See* C.V.I at 18:40:40-50.  At the time Gutierrez is telling Nazario to get directly onto the ground, Nazario is asking if a commanding officer is available.  After Nazario stands outside the vehicle for approximately ten seconds — and after additional commands to get onto the ground — Gutierrez strikes his knee into Nazario's leg, while Crocker began to pull on Nazario's other arm.

Lt. Nazario is then pushed to the ground, with his eyes still closed.  Nazario then begins to sob, and repeatedly exclaims that "this is fucked up." *See* C.V.I at 18:41:24-50.  The Policemen order Nazario — who is now on his hands and knees — to lie on his stomach.  Nazario, however, tries to remain on his hands and knees.  After approximately 40 seconds, Nazario lies on the ground and is handcuffed.  At that point, approximately six minutes had elapsed since Nazario had parked his vehicle.

### 3.

Shortly after being handcuffed, the Policemen get Lt. Nazario standing again.  They also cease their shouting and begin talking with Nazario.  They ask Nazario if there are any guns in the vehicle, and he says yes.  Gutierrez then asks why Nazario was not complying, and Nazario says that he complied by keeping his hands out of the vehicle.  Gutierrez accused Nazario of refusing to pull over, and Nazario replied that he pulled over in a well-

lit area for the safety of everyone, and that he respects police officers. Gutierrez says this is the "wrong answer." *See* C.V.I at 18:43:21.

The Policemen then sit Lt. Nazario — with his eyes closed from the pepper spray — on a trash can next to his car. Emergency medical personnel arrive, and they begin providing aid to Nazario in overcoming the pepper spray. As Nazario is recovering, his personal information is processed by the Windsor Police Department. That effort revealed no warrants and a valid Virginia concealed carry permit. Crocker searched Nazario's vehicle, found a pistol near the vehicle's center console, unloaded it, and had his Windsor dispatch run the serial number. Dispatch uncovered no issues with the firearm.

Gutierrez again asks Lt. Nazario why he did not pull over. In reply, Nazario acknowledges that there were earlier areas to pull over, but those areas were dark. Nazario did not think it was safe to stop earlier. Gutierrez replies that pulling over at the BP station "was not the problem . . . the problem was when you refused to get out of the car." *See* C.V.I at 18:52:00-08. After Nazario was given a brief time to recover, a prolonged discussion between the Policemen and Nazario began. During that conversation, Crocker starts to make an offer to Nazario:

> This can go one of two ways, okay? I do not want to hem you up. . . . You have made Lieutenant in the Army. How hard was that? . . . And what would this do to your career?

11

*See* C.V.II at 19:04:40-05:00.[5]  Nazario agreed that he had worked hard to be an Army Lieutenant, and that this event could damage his military career.

After talking to a superior officer, Gutierrez begins making an offer not dissimilar to Crocker's.  Gutierrez states there are "two ways we can handle this."  *See* C.V.II at 19:06:15-20.  Either Lt. Nazario could (1) be charged and arrested for failure to display a license and obstruction of justice and "fight it," which is his "right as a citizen," or (2) he could "chill" and "let this go."  *Id.* at 19:07:20-30, 19:08:20-25.  Nazario declined to proceed with charges and decided to "chill."

Lt. Nazario was then uncuffed, and Gutierrez emphasized to Nazario that it was normal and common for a person to wait to pull over into a well-lit area.  Gutierrez said that drivers delay pulling over until they arrive at a well-lit location "all the time" and "a lot."  *See* C.V.II at 19:10:50-58.  After the effects of the pepper spray lessened, Nazario continued on his drive to Petersburg.

All told, during the encounter Lt. Nazario remained calm, raising his voice only when he was on his hands and knees after being pepper sprayed.  Nazario did not engage in erratic or furtive movements, gesticulate wildly, or otherwise threaten the Policemen. He did not remove his hands from the Policemen's view without first telling them of his intention to do so.  For part of the traffic stop, the Policemen gave Nazario exclusively inconsistent commands — that is, to keep his hands outside the vehicle and also to exit the

---

[5] Citations herein to "C.V.II ___" refer to the contents of the second body-worn camera footage of Crocker submitted by the parties.

vehicle.  Nazario was detained for a total of 80 minutes, easily exceeding the length of a normal or reasonable traffic stop.

## B.

### 1.

In April 2021, Lt. Nazario filed his operative eight-count complaint against both Crocker and Gutierrez in the Eastern District of Virginia.  Nazario alleged a mix of federal claims and Virginia state law claims, which were as follows:

- Violation of the Fourth Amendment — Unreasonable Seizure (Count I);

- Violation of the Fourth Amendment — Excessive Force (Count II);

- Violation of the Fourth Amendment — Illegal Search (Count III);

- Violation of the First Amendment — Retaliation (Count IV);

- Common Law Assault (Count V);

- Common Law Battery (Count VI);

- Common Law False Imprisonment (Count VII); and

- Illegal Search in Violation of Va. Code Ann. § 19.2-59 (Count VIII).

*See* J.A. 49-62.  For relief, Nazario sought, inter alia, compensatory damages, punitive damages, costs, expenses, and attorneys' fees.

After engaging in discovery, the parties — Nazario and the two Policemen — each moved for summary judgment.  And on August 9, 2022, the district court filed a comprehensive Memorandum Opinion resolving those motions.  The court began by ruling that the Policemen had probable cause to stop Lt. Nazario for committing a traffic infraction for failure to properly display a license plate, and probable cause to arrest

13

Nazario for committing misdemeanor "eluding," misdemeanor "obstruction of justice," and the misdemeanor offense of "failing to obey an order of a conservator of the peace."

From there, the district court awarded the Policemen qualified immunity on Lt. Nazario's claims for unreasonable seizure, excessive force, and First Amendment retaliation. The court awarded summary judgment to Nazario on his claims for an unconstitutional search (Count III) and a search in violation of Virginia law (Count VIII), but only as to Crocker. All remaining claims, along with the issue of damages on Counts III and VIII, were to be resolved by a jury trial.

2.

The outstanding claims proceeded to trial in early January 2023, and the trial was shaped by the district court's earlier rulings on probable cause. For example, the court — over Lt. Nazario's objection — gave jury instructions based on its earlier ruling that there was probable cause for four violations of Virginia law. Those instructions were:

> [The court has] determined that at the time that Defendant Crocker initiated the traffic stop . . . he had probable cause to believe that [Nazario] lacked a license plate and was eluding him.

> [The court has] determined that Defendant Crocker had probable cause to believe that [Nazario] committed obstruction of justice without force and failure to obey.

*See* J.A. 895, 897. The court also instructed the jury that it was to factor in whether the Policemen had a lawful justification or excuse for their actions when assessing Nazario's claims of assault, battery, and false imprisonment. Both the lawyers for Nazario and the Policemen argued to the jury about probable cause and its relevance to the Policemen's conduct. *See* J.A. 865-67 ("The Court has already held, and it's in your instructions, that

14

there was probable cause for eluding a police officer, for obstruction of justice, and for failure to obey a lawful police order.").

The jury returned a verdict that was largely in favor of the Policemen. Crocker was found not liable for assault, battery, or false imprisonment. The jury awarded no damages for Crocker's unconstitutional search. As for the search in violation of Virginia law, Crocker was found liable for punitive damages in the sum of $1,000, but no compensatory damages were awarded. Gutierrez was found not liable for an unconstitutional search, battery, false imprisonment, or a search in violation of Virginia law. Gutierrez, however, was found liable for an assault and for $2,685 in compensatory damages.

On January 18, 2023, the district court entered its judgment. Lt. Nazario then filed a motion for a new trial and to alter or amend the judgment. On May 3, 2023, the court denied the motion for a new trial but amended the judgment to make an award of nominal damages to Nazario for the unconstitutional Fourth Amendment search, and for the unlawful search in violation of Virginia law, as to Crocker only. Nazario has timely noted this appeal and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

Broadly, Lt. Nazario raises appellate challenges to the district court's award of qualified immunity and to its jury instructions. At the heart of these challenges is his contention that the court erred in making three of its probable cause determinations. The Policemen, in addition to responding to Nazario's arguments, argue that Nazario's appeal is procedurally barred. Thus, to resolve this appeal, four primary issues must be addressed:

15

(1) whether Nazario is procedurally barred from pursuing his appeal, (2) whether the court erred on three of its probable cause determinations, (3) whether the court erred in awarding qualified immunity to the Policemen on three of Nazario's claims, and (4) whether the court committed reversible error in its jury instructions. Each issue will be assessed in turn. And as explained herein, the court erred in awarding qualified immunity to Gutierrez on Nazario's unreasonable seizure claim (Count I), but otherwise did not commit reversible error.

A.

The Policemen argue that, to the extent Lt. Nazario pursues factual issues on appeal, he is procedurally barred from doing so by the Supreme Court's 2023 decision in *Dupree v. Younger*, 598 U.S. 729. In *Dupree*, the Court highlighted that some trial court orders can become "unreviewable after final judgment because they are overcome by later developments in the litigation." *See Dupree*, 598 U.S. at 734. Included in that group of orders are those denying summary judgment on sufficiency-of-the-evidence grounds. *Id.*; *see also Ortiz v. Jordan*, 562 U.S. 180, 184 (2011). If a case that fits into such a circumstance proceeds to trial, the party that seeks to preserve a factual challenge to a summary judgment order must make a post-trial motion under Federal Rule of Civil Procedure 50. *See Dupree*, 598 U.S. at 735 (2023).

Contending that Lt. Nazario did not properly raise his appellate issues concerning the summary judgment order in a post-trial Rule 50 motion, the Policemen maintain here that Nazario is barred from appealing that order, insofar as he raises factual contentions. The Policemen, however, misunderstand *Dupree*. As discussed above, the reviewability

16

and preservation rules at play in *Dupree* (and similar decisions) are applicable only when the appellant is challenging the denial of a summary judgment motion after a trial has been conducted. *See Dupree*, 598 U.S. at 735 (ruling that "factual issues addressed in summary-judgment denials are unreviewable on appeal" after trial); *see also Ortiz*, 562 U.S. at 190; *Younger v. Crowder*, 79 F.4th 373, 378 (4th Cir. 2023); 15B Wright and Miller, *Federal Practice and Procedure* § 3914.28 n.18 (2d ed.). *Dupree*'s principles do not apply to a party appealing an award of summary judgment.

Here, Lt. Nazario is not appealing the denial of his summary judgment motion. Rather, he appeals the district court's award of the partial summary judgment awarded to the Policemen and from the jury verdict. Thus, Nazario's appellate challenges fall outside of the ambit of the *Dupree* principles.

## B.

The primary thrust of Lt. Nazario's appeal is that the district court erred in its summary judgment rulings that the Policemen had probable cause for three misdemeanor offenses — (1) the crime of "eluding" under Va. Code Ann. § 46.2-817(A); (2) "obstruction of justice" under Va. Code Ann. § 18.2-460(A); and (3) "failure to obey an order of a conservator of the peace" under Va. Code Ann. § 18.2-464. Nazario maintains that these erroneous probable cause rulings tainted not only other parts of the court's summary judgment awards, but also the jury instructions. Importantly, Nazario does not challenge the court's ruling that the Policemen had probable cause to pull him over for a traffic infraction — failure to properly display a license plate under Va. Code Ann. § 46.2-715 and § 46.2-716. After reviewing the applicable legal standards, Nazario's challenges

to the court's probable cause rulings are assessed in turn.  As explained below, although the Policemen had probable cause for the misdemeanor of "obstruction of justice," they did not possess probable cause for the misdemeanor offenses of "eluding" or "failure to obey a conservator of the peace."

1.

In reviewing a district court's award of summary judgment, we apply the same legal standards as those applied by that court.  *See Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 349.  Under that standard, "[s]ummary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Lawson v. Union County Clerk of Court*, 828 F.3d 239, 247 (4th Cir. 2016) (internal quotation marks omitted).

In determining whether probable cause exists, the courts "examine the totality of the circumstances known to the officer at the time."  *See Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996).  Probable cause exists when the facts and circumstances known to a police officer "would warrant the belief of a prudent person that the arrestee had committed or was committing an offense."  *See United States v. Garcia*, 848 F.2d 58, 59-60 (4th Cir. 1988).  Probable cause "is an objective standard of probability that reasonable and prudent persons apply in everyday life," which requires more than a "bare suspicion" but less than the evidence necessary to convict.  *See United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998) (en banc).  At bottom, "the substance of all the definitions of probable cause is a reasonable ground for belief of guilt."  *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation marks omitted).

2.

First, Lt. Nazario argues on appeal that the district court erroneously ruled that the Policemen had probable cause for the misdemeanor of "eluding" under Virginia law. The Virginia Code provides, in relevant part, that the offense of "eluding" occurs when:

> Any person who, having received a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle in a willful and wanton disregard of such signal.

*See* Va. Code Ann. § 46.2-817(A).

The district court ruled that "failing to immediately pull over can constitute [misdemeanor] eluding" under Virginia law, and therefore the Policemen had probable cause when Lt. Nazario failed to immediately pull over. *See* J.A. 768. Central to the court's reasoning was its adherence to an Eleventh Circuit decision called *Manners v. Cannella*, 891 F.3d 959, (11th Cir. 2018). In *Manners*, our sister circuit ruled — in a decision that is not precedent here — that probable cause existed for a violation of Florida's eluding statute when a driver continued past locations where he "could reasonably or safely have complied with the officer's direction" to pull over. *See Manners*, 891 F.3d 959, 971. And the Eleventh Circuit opined that probable cause could exist even if Manners had merely slowed in response to a police signal, or if he had failed to promptly pull over in order to reach a well-lit gas station at night. *Id.* at 971-72.

In a decision not relied on by the district court, the Tenth Circuit — similar to *Manners* — ruled that driving for two miles after police officers first signaled the suspect to stop can establish probable cause of a violation of New Mexico's eluding statute, even if the reason for a failure to stop was for the driver to reach a place he felt safe, in light of

19

the reputation of the local police. *See Marshall v. Columbia Lea Regional Hosp.*, 345 F.3d 1157, 1166 (10th Cir. 2003). The Tenth Circuit recited that a driver is required to respond "promptly" and "[n]either belief in innocence nor apprehensions regarding the police justify failure to obey a lawful order." *Id.* Additionally, our colleagues in the District of Maryland have recognized — in another non-precedential ruling — that a police officer has probable cause to stop a driver for eluding under Maryland law when the driver saw the lights of the patrol car but continued to his home because it was a "safer location." *See Stutzman v. Krenik*, 350 F. Supp. 3d 366, 378 (D. Md. 2018).

Our Court, however, has never ruled on whether a police officer would possess probable cause in circumstances such as those here, not only under Virginia law but under the law of any State. And assessing the facts known to the Policemen here — in the light most favorable to Lt. Nazario — we are unable to say that a prudent person would believe that Nazario committed the misdemeanor offense of eluding under Virginia law. We will therefore decline to adhere to the path seemingly followed by our sister circuits in *Manners* and *Marshall*, insofar as they may be applicable here.

Shortly after Crocker initiated his emergency lights, Lt. Nazario reduced his speed well below the posted speed limit, to 18 miles per hour while driving in a 35-mile-per-hour zone. Driving slowly is a recognized way to show an intention to comply with a police officer's signal to pull over. *See Proffitt v. Commonwealth*, No. 1424-10-2, 2011 WL 5346032, at *3 (Va. Ct. App. Nov. 8, 2011). Additionally, other than turning into the BP station, Nazario remained on a heading that was west on the main highway — Route 460 — and made no turns.

20

Nevertheless, the parties dispute the significance of the distance and time that elapsed before Lt. Nazario pulled over. The Policemen contend that Nazario could and should have pulled over sooner, and that his failure to do so provides probable cause for the misdemeanor eluding offense. But it must be said that the distance and time that elapsed were relatively minor — approximately a mile and less than two minutes. Additionally, Nazario's delay in pulling over is even more innocuous because it was a dark early winter evening in eastern Virginia, and the BP station was the most well-lit location visible and available.[6]

Nevertheless, any suspicion of eluding that formed in the minds of the Policemen should have dissipated when Lt. Nazario pulled over. He pulled into the well-lit BP station and parked his vehicle, and the fact that the driver of the vehicle was looking for a safe place to pull over was then obvious.

In these circumstances — where Lt. Nazario (1) lowered his speed well below the speed limit, (2) travelled approximately a mile and for less than two minutes, (3) made no turn off the main highway, (4) pulled into the best-lit location available, and (5) parked his vehicle — a reasonable and prudent person would not believe that Nazario was intending to willfully and wantonly disregard Crocker's signal. Thus, the district court erred in ruling

---

[6] The record evidence also suggests that a reasonable person would not attach probable cause to a failure to immediately pull over at night. The senior police officer on the scene, Gutierrez, acknowledged to Lt. Nazario that there was no problem with waiting to pull over into the well-lit BP station, and that it happens "all the time" and "a lot." *See* C.V.II at 19:10:50-58.

that the Policemen had probable cause that Nazario had committed the misdemeanor of "eluding" under Virginia law.

3.

Next, Lt. Nazario argues that the Policemen lacked probable cause for the misdemeanor of "obstruction of justice" under Virginia law.  Virginia's obstruction of justice statute provides, in relevant part, as follows:

> If any person without just cause knowingly obstructs . . . any law-enforcement officer . . . in the performance of his duties as such or fails or refuses without just cause to cease such obstruction when requested to do so . . . he is guilty of a . . . misdemeanor.

See Va. Code Ann. § 18.2-460(A).  The district court, applying the above definition, determined that Lt. Nazario's refusal to obey the orders of the Policemen to exit his vehicle established probable cause for the misdemeanor of obstruction of justice.

Central to the issue surrounding probable cause is a distinction recognized by the Virginia courts.  That is, an obstruction of justice has not occurred "when a person fails to cooperate fully with an officer or when the person's conduct merely renders the officer's task more difficult but does not impede or prevent the officer from performing that task." See *Ruckman v. Commonwealth*, 505 S.E.2d 388, 389 (1998).  Our Court has acknowledged this important dividing line in Virginia law.  *See Wilson v. Kittoe*, 337 F.3d 392, 400 (4th Cir. 2003).

Despite this distinction, a failure to comply with the directive of a police officer can, in some instances, constitute an obstruction offense.  That is, obstruction of justice can include "passive direct obstruction, where the officer seeks to make the defendant act

22

directly and the defendant refuses or fails to act as required," so long as "the obstructive behavior clearly indicates an intention on the part of the accused to prevent the officer from performing his duty." *See Thorne v. Commonwealth*, 784 S.E.2d 304, 308 (Va. Ct. App. 2016) (brackets and emphasis omitted).

For example, even an obstruction of justice conviction can be sustained when a driver (1) refuses to roll down her window, precluding the police officer from checking the window tint, and (2) indicates in shouts that she knew she was preventing the officer from doing so. *See Thorne*, 784 S.E.2d at 309. Similarly, a police officer has probable cause for an obstruction charge if a driver refuses repeated commands to stay in her vehicle, and despite these instructions begins walking away from the scene shouting "I guess I'm obstructing then." *See Lightfoot v. Commonwealth*, No. 0313-20-2, 2021 WL 1257140, at *5 (Va. Ct. App. Apr. 6, 2021).

Consistent with those decisions, probable cause for obstruction of justice exists in this situation because Lt. Nazario refused to exit the vehicle when commanded to do so, stated that he did not need to exit the vehicle, and used his arm to close the vehicle's door as the Policemen sought to open it. The orders to Nazario to step out of the vehicle were lawful because the Policemen had probable cause to stop Nazario's vehicle for failure to clearly display a license plate. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (per curiam) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment").

23

Lt. Nazario maintains that he was adhering to the safest course of action by keeping his hands outside the vehicle and remaining calm. As he views it, such conduct only frustrated the purpose of the Policemen, without actively preventing them from completing their goal of having Nazario exit the vehicle. Nazario, however, did more than simply refuse to get out — he pulled the vehicle door shut with his arm after Crocker unlocked the driver-side door and began to open it. When that occurred — combined with his earlier statements that he would not exit the vehicle —Nazario's conduct would indicate to a reasonable and prudent person that Nazario intended to actively and intentionally thwart the requests that he exit the vehicle. In sum, given the low bar of probable cause, the district court did not err in ruling that the Policemen possessed probable cause for the misdemeanor offense of obstruction of justice under Virginia law.

4.

Finally, Lt. Nazario contends that the Policemen did not have probable cause for Virginia's misdemeanor offense of "failing to obey a conservator of the peace."[7] Virginia's failure to obey statute provides, in pertinent part, as follows:

> If any person, being required by a conservator of the peace on view of a breach of the peace or other offense to bring before him the offender, refuse or neglect to obey the conservator of the peace, he shall be guilty of a . . . misdemeanor.

---

[7] Nazario argues on appeal that the Policemen did not subjectively believe that there was probable cause for a failure to obey charge, and that the entire discussion of Virginia's failure to obey statute is simply a post hoc litigating position. When evaluating whether probable cause exists, however, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

*See* Va. Code Ann. § 18.2-464.  The district court ruled that Nazario's failure to comply with the Policemen's directives to get out of his vehicle constituted probable cause for failure to obey.

Although not discussed by the parties or the district court, it is apparent to us that the Virginia statute being relied on here does not apply.  Virginia has supplied us an exhaustive statutory definition of what constitutes a "conservator of the peace," outlined in Va. Code Ann. § 19.2-12.  Specifically absent from that definition are, however, State, County, City, or local law enforcement officers.  *Id.*; *see also Tokora-Mansary v. Commonwealth*, No. 2494-08-4, 2009 WL 5083540, at 5* (Va. Ct. App. Dec. 29, 2009) (ruling that defendant cannot be found guilty under Va. Code Ann. § 18.2-464 "because law enforcement officers are not listed as conservators of the peace in that statute").  Absent an order from a conservator of the peace, the court erred in concluding that there was probable cause that Lt. Nazario failed to obey such an order.

In this case, the Policemen had probable cause for two violations:  (1) a traffic infraction for failure to properly display a license plate; and (2) a misdemeanor offense of obstruction of justice.  Only the latter — obstruction of justice — is an arrestable criminal offense.  *See* Va. Code Ann. § 46.2-113; § 18.2-8.

## C.

Lt. Nazario next challenges on appeal the district court's award of qualified immunity to the Policemen on his claims of unreasonable seizure (Count I), excessive force (Count II), and First Amendment retaliation (Count IV).  After briefly explaining the doctrine of qualified immunity, we will examine each of his claims in turn.  As explained

below, we agree that Gutierrez is not entitled to qualified immunity on the unreasonable seizure claim, but otherwise affirm.

1.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). In resolving whether to award qualified immunity at summary judgment, courts are to engage in a "two-pronged inquiry." *See Tolan v. Cotton*, 572 U.S. 650, 655 (2014). The first prong of that inquiry must determine whether — in a light most favorable to the injured party — "the officer's conduct violated a constitutional right." *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second prong asks whether the right at issue in the first prong was "clearly established at the time" of the contested action. *Pearson*, 555 U.S. at 227. Accordingly, a court may award qualified immunity to an official if either (1) there is no violation of a constitutional right, or (2) the constitutional right was not clearly established. *Id.* at 236.

On the second prong, for a constitutional right to be clearly established, its contours "must be sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The unlawfulness of an official's conduct must be "apparent in light of pre-existing law." *See Booker v. S.C. Dept. of Corrections*, 855 F.3d 533, 538 (4th Cir. 2017) (internal quotation marks omitted). And to be apparent in that context requires that the "constitutional question [be] beyond debate." *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). And a

26

constitutional question is not always "beyond debate" because of the absence of precedent establishing a specifically adjudicated right. That is, the phrase "clearly established" will include "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." *See Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992).

The applicable body of precedent for conducting the "clearly established" inquiry will involve the "decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." *See Hill v. Crum*, 727 F.3d 312, 322 (4th Cir. 2013) (internal quotation marks omitted). In the absence of controlling authority, however, "a robust consensus" of persuasive authority may demonstrate the existence of a rule "that every reasonable official would know." *See District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (internal quotation marks omitted). And there could be a "rare obvious case," where general constitutional standards can clearly establish a right, "even though existing precedent does not address similar circumstances." *Id.* at 590 (internal quotation marks omitted).

### 2.

Addressing Lt. Nazario's claim for an unreasonable seizure (Count I), the district court ruled that conflicting orders along with "the aiming of firearms, and the threats made by Defendant Gutierrez," were sufficient evidence to establish an impermissibly prolonged seizure, in contravention of the Fourth Amendment. *See* J.A. 776. The court, however, awarded both of the Policemen qualified immunity.

27

a.

We begin by identifying the constitutional right at issue and addressing whether the conduct of the Policemen — in a light most favorable to Lt. Nazario — established an unreasonable seizure in violation of the Fourth Amendment. As recited above, the Policemen had probable cause to stop Nazario for his failure to properly display a license plate, and the remaining issue is whether the Policemen's conduct after the stop — i.e., aiming firearms at Nazario, giving conflicting commands, and making threats, unreasonably prolonged the stop.[8]

At the time of their stop of Lt. Nazario, the Policemen had probable cause for only a single traffic infraction. Because it was a seizure that was justified only by a traffic violation, the stop of Nazario would become unlawful "if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350-51 (2015) (internal quotation marks and brackets omitted). Generally, the "mission" or purpose of a traffic stop involves "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355.

---

[8] Nazario contends on appeal that the district court committed reversible error because it failed to address Gutierrez's deployment of pepper spray, Gutierrez's use of knee strikes, and his rough takedown of Nazario, when it analyzed Nazario's claim of an unreasonable seizure. We agree that "[t]he Fourth Amendment's prohibition on unreasonable seizures includes the right to be free of seizures effectuated by excessive force." *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (internal quotation marks omitted). The reasonableness of the conduct of the Policemen involves traditional applications of force, however, and is to be analyzed under the excessive force framework, which is what the court did.

Beginning with firearms being pointed at Lt. Nazario by the two Policemen, we are satisfied that the district court correctly determined that Nazario has sufficient evidence to prove a Fourth Amendment violation. Put simply, to point a firearm at a person is a threat with deadly force, and is therefore likely to instill fear, which could manifest into panic and a rash reaction. If unwarranted, the pointing of firearms in a traffic stop situation can needlessly escalate the stop, making it more dangerous for everyone involved. The Fourth Amendment, which is grounded in reasonableness, can be transgressed by an unwarranted threat of deadly force. Thus — although we may not have heretofore adopted the principle — we are satisfied that it can be unconstitutional to hold a person at prolonged gunpoint when he is compliant and presents no danger to the public or law enforcement officers.[9]

For nearly all of their stop of Lt. Nazario, he was compliant and presented no danger to the Policemen. Nazario had tried to mitigate any danger to those involved by pulling into the well-lit area of the BP station. And even though Nazario did not comply with the Policemen's commands that he get out of the vehicle, his noncompliance with that conflicting order seemed necessary in order to comply with directives of the Policemen to keep his hands outside the vehicle. If Nazario had lowered his hands into the vehicle —

---

[9] Although normally analyzed in the context of an excessive force claim, such a principle has been expressly recognized by at least three of our sister circuits. *See Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009) (ruling that "pointing guns at persons who are compliant and present no danger is a constitutional violation"); *Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005) (recognizing that pointing firearm at infant falls outside Fourth Amendment's objective reasonableness standard); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1192 (10th Cir. 2001) (ruling that pointing firearms at persons "should be predicated on at least a perceived risk of injury or danger to the officers or others").

given the Policemen's liberal firearm use — the situation could have quickly turned fatal. A large portion of Nazario's "noncompliance," therefore, was in reaction to the Policemen's actions and inconsistent commands.

Of importance, the pointing of firearms at Lt. Nazario by the Policemen was unreasonably exacerbated by the verbal death threats made by Gutierrez. Gutierrez's first explicit threat — telling Nazario that he was "fixing to ride the lightning" — is a colloquial reference to death by the electric chair.[10] *See* J.A. 689-90. And when Nazario said he was afraid to get out of his vehicle, Gutierrez promptly confirmed his fear, saying that Nazario "should be." *See* C.V.I at 18:37:55-56, 18:38:17-18. And both those threats came after Nazario calmly asked the Policemen about the purpose of the stop. At no point was Gutierrez justified in either threatening or using deadly force. As a result, his threats were unwarranted and much more than could be justified. When these threats were made, the Policemen only had probable cause to stop a vehicle for a traffic infraction, and Nazario had not threatened them. In a light most favorable to Nazario, insofar as the threatening conduct prolonged the traffic stop, the seizure was unreasonable.

b.

On the second prong of qualified immunity, i.e., the clearly established issue, we agree with the district court that Crocker is entitled to qualified immunity because his conduct did not violate a clearly established constitutional right. We do not agree,

---

[10] The Policemen have maintained that this phrase was only a reference to being tased. In a light most favorable to Nazario, however, it was an explicit and obvious death threat.

however, that Gutierrez is entitled to qualified immunity, in view of his death threats against the Army Lieutenant.

Our Court has not addressed whether or when the simple act of a police officer pointing firearms at a person during a traffic stop is unconstitutional. Although our sister circuits have made rulings that provide some guidance, the law in this Circuit was not sufficiently developed at the time of Lt. Nazario's encounter with the Policemen for them to reasonably know that pointing firearms at Nazario in these circumstances would violate the Fourth Amendment.

In fact, our precedent provides that "[i]t is well established that officers performing a lawful stop are authorized to take such steps as are reasonably necessary to protect their personal safety thereafter." *See United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007) (quotation marks and ellipses omitted). We have also acknowledged that "traffic stops alone are inherently dangerous for police officers." *See United States v. Robinson*, 846 F.3d 694, 698 (4th Cir. 2017) (en banc). And an officer's lawful use of a firearm is directly tied to whether safety concerns are present. *See Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001). Plus, the Fourth Amendment does not require a police officer "to wait until a gun is pointed at [him] before [he] is entitled to take action." *Id.* Thus, in these circumstances — where the Policemen had stopped a darkly tinted and large vehicle at night that was slow in pulling over — our law is not sufficiently developed to make it obvious that pointing their firearms at Lt. Nazario unconstitutionally prolonged his seizure.

Gutierrez's conduct, combined with his death threats against Lt. Nazario, was a clear violation of the Fourth Amendment that lies outside the protection of qualified

immunity. Again, those threats were unwarranted, and were well outside the tasks required to complete the mission of his traffic stop. Although we have not heretofore ruled that a police officer should not make unnecessary death threats during a traffic stop, "we need not . . . assume that government officials are incapable of drawing logical inferences, reasoning by analogy, or exercising common sense." *See Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019). If police officers have been informed that they are not to extend a traffic stop beyond its primary mission of issuing a traffic ticket, it is obvious that they should not prolong the stop by making unwarranted death threats. In these circumstances, we will reverse the district court's award of qualified immunity to Gutierrez and remand for further proceedings on Lt. Nazario's unreasonable seizure claim in Count I.

### 3.

As to Lt. Nazario's claim for excessive force (Count II), the district court ruled that, in a light most favorable to Nazario, the Policemen contravened the Fourth Amendment by utilizing excessive force against Nazario. That is, the Policemen were not entitled to summary judgment on the first prong of the qualified immunity analysis — that is, whether a constitutional violation occurred. The court, however, ruled that the Policemen were entitled to qualified immunity under its second prong, that is, the clearly established requirement. As discussed below, we agree that the Policemen are entitled to qualified immunity on Count II.

### a.

As recognized by the parties and the district court, our inquiry into whether the conduct of the Policemen constituted excessive force is guided by the framework of

*Graham v. Connor*, 490 U.S. 386 (1989).  That is, although we give "careful attention to the facts and circumstances of each particular case," there are three factors central to the inquiry:  "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight."  *See Graham*, 490 U.S. at 396.  And in the Fourth Circuit, we consider a fourth factor — "the extent of the plaintiff's injuries."  *See Hupp v. Cook*, 931 F.3d 307, 322 (4th Cir. 2019); *see also Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994).  Ultimately, the overarching inquiry is whether the force that was used was proportional under the circumstances.  *See Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015).

(1)

The first *Graham* factor addresses the severity of the crime at issue, and weighs in Lt. Nazario's favor.  As discussed above, *see* II.B.1-4, the Policemen had probable cause for a non-criminal, traffic infraction and a misdemeanor obstruction of justice.  The traffic infraction created no public danger, and its severity was extremely minimal.  *See Ray*, 781 F.3d at 102 (ruling that nonviolent misdemeanors weigh against finding that significant force was justified).  A misdemeanor obstruction of justice is slightly more severe — indeed, it is a criminal offense involving the intentional frustration of law enforcement. That offense, however, does not involve violence, nor does it pose sufficient risk of danger to either the public or the police officers to weigh in favor of using significant force. Accordingly, the first *Graham* factor weighs in favor of Nazario.

33

(2)

The second *Graham* factor addresses whether the suspect posed an immediate threat to the safety of the police officers or others.  Until Gutierrez pepper sprayed Lt. Nazario, he had remained calm and was repeatedly asking simple questions about the purpose of being pulled over.  Nazario never gesticulated wildly or reached into his vehicle.  In fact, Nazario kept his hands in the universal position of surrender, offering no threat — verbal or otherwise — to the safety of the Policemen.  In such circumstances, the second *Graham* factor strongly weighs in favor of Nazario.  *See e.g.*, *Hupp*, 931 F.3d at 323; *Yates v. Terry*, 817 F.3d 877, 885 (4th Cir. 2016).

(3)

The third *Graham* factor — whether Lt. Nazario was actively resisting arrest or attempting to evade — comes down slightly in Nazario's favor.  Again, in the light most favorable to Nazario, he was not eluding the Policemen and was merely pulling over at the first safe place to stop, the BP station.  Additionally, Nazario was calm and did not indicate that he was going to flee, nor was he engaged in furtive movements.  He had also parked and turned off his vehicle at the request of the Policemen.  Even Nazario's failure to exit the vehicle upon request can — as discussed above — be explained by the weighty safety concerns of having to lower his hands inside the vehicle in the presence of armed and excited police officers.  Those facts strongly suggest that Nazario was not resisting arrest or attempting to evade the Policemen.

Lt. Nazario, however, also engaged in behavior that is indicative of resistance.  Early on, he argued with the Policemen that he did not have to exit the vehicle for a traffic stop.

34

Most importantly, before being pepper sprayed, Nazario used his arm to close the door that Crocker had begun to open. And although Nazario's refusal to obey commands to step out of the vehicle can be largely excused by his prudence in keeping both hands raised, Nazario's conduct of pulling the door shut cannot be excused. Such conduct was not passive or indicative of "instinctively trying to protect himself from the [Policemen's] onslaught." *See Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994). Additionally, after stepping out of the vehicle, Nazario did not readily comply with the Policemen's commands to get on the ground, refusing to lie down on his stomach. Such conduct diminishes the extent to which the third *Graham* factor weighs in favor of Nazario.

(4)

Finally, we assess the fourth factor, as created by our Court — the extent of Lt. Nazario's injuries. For starters, Nazario was subjected to four blasts of pepper spray, three of which were directly to his face. The record reveals very clearly that pepper spray is a potent chemical agent, the effects of which are immediate and intense — causing pain; inflammation of the eyes, nose, and throat; and loss of breath. *See also United States v. Neill*, 166 F.3d 943, 949 (9th Cir. 1999) (ruling that pepper spray is a dangerous weapon). After all, the purpose of pepper spray is to "incapacitate" its target. *See Iko v. Shreve*, 535 F.3d 225, 239, 241 (4th Cir. 2008). Additionally, pepper spray will naturally produce psychological effects such as disorientation and fear. *See Danley v. Allen*, 540 F.3d 1298, 1304 (11th Cir. 2008).

And Lt. Nazario experienced the full brunt of the pepper spray, experiencing a large swath of its adverse effects for well over a half hour. Those effects, however, were not

permanent or particularly grievous, and therefore their injurious extent is "slight." *Hupp*, 931 F.3d at 322. Nevertheless, Nazario's injuries were temporarily debilitating and painful. Thus, the fourth factor is somewhat in Nazario's favor.

Looking at the four factors cumulatively, the Policemen's use of force — including their pepper spraying of a calm person who had his hands visible in a prolonged sign of surrender and compliance — was very excessive. On these facts, evaluated in the light most favorable to him, Lt. Nazario has a triable claim under Count II for a violation of the Fourth Amendment.

b.

We nevertheless affirm the district court's grant of qualified immunity on the excessive force claim in Count II because the Policemen's conduct did not violate a clearly established constitutional right. On appeal, Lt. Nazario argues that an award of qualified immunity was error because when "the *Graham* factors strongly favor the plaintiff, the defendants are not entitled to qualified immunity." *See* Appellant's Op. Br. at 36. Indeed, our Court has ruled that an award of qualified immunity is inappropriate when "the weakness of the *Graham* factors was so apparent that any reasonable officer would have realized that the force employed was excessive." *See Ray*, 781 F.3d at 106. As outlined above — despite the violation of a Fourth Amendment constitutional right — the *Graham* factors do not sufficiently weigh in favor of Nazario, and it is not so apparent that any reasonable officer would have realized that the force employed was excessive. Thus, Nazario's assertion of error on Count II — the use of excessive force — must also fail.

It is particularly illuminating that — under our precedent — the Policemen were not on notice that their use of pepper spray violated a clearly established right. The most on-point Fourth Circuit authority regarding excessive force and pepper spray is our 2001 decision in *Park v. Shiflett*, 250 F.3d 843 (4th Cir. 2001). In *Park*, a woman observed her husband being arrested by police officers. She ran to her husband and, in response, the police officers grabbed her, twisted her arm behind her back, threw her against a wall, and handcuffed her. After she had been handcuffed, the police officers twice discharged pepper spray into her eyes at short range. And we ruled that the use of pepper spray in that setting constituted excessive force. *See* 250 F.3d at 853.

In a decision with underlying facts somewhat like those here — *Omeish v. Kincaid* — we concluded that *Park* did not "sufficiently inform officers about the use of pepper spray," making a grant of qualified immunity appropriate. *See* 86 F.4th at 557. As described therein, Omeish was pulled over on a busy two-lane road at night for a failure to stop at a red light. She refused to produce her driver's license after repeated requests by the police officer, and the officer told her he was going to arrest her. The officer then asked Omeish more than 25 times to step out of her vehicle. But she declined, even after the officer grabbed her arm. A struggle ensued, and when Omeish reached for a dark object on the passenger side of the vehicle, the officer sprayed her with pepper spray. The district court awarded qualified immunity to the officer who used the spray.

In affirming the district court's award of qualified immunity, we noted some salient distinctions between *Park* and *Omeish*. In *Park*, for example, the pepper spray was used after the suspect was in handcuffs and it was otherwise completely unneeded. Additionally,

in *Park* the woman was not seen reaching for anything, nor was it in the context of a traffic stop, at night, or on a busy two-lane road.

The situation here is more like *Omeish*, and our decision in *Park* would not have made it beyond debate that the Policemen's conduct violated a constitutional right.  The pepper spray was deployed during a traffic stop, at night, when the suspect was not handcuffed.  Thus, the unconstitutionality of the Policemen's conduct does not follow clearly from *Park*, entitling the Policemen to qualified immunity.  Therefore, the district court did not err in its award of qualified immunity on Nazario's excessive force claim (Count II).

### 4.

Lt. Nazario also maintains that the district court erred in awarding qualified immunity to the Policemen on Nazario's First Amendment retaliation claim (Count IV).  A claim for First Amendment retaliation has three elements:  (1) the plaintiff "must demonstrate that his speech is protected;" (2) the defendant took an action that "adversely affected" that protected activity; and (3) there was a "causal relationship" between the protected speech and the adverse action.  *See Blankenship v. Manchin*, 471 F.3d 523, 528 (4th Cir. 2006).

The theory of Lt. Nazario's retaliation claim is that the Policemen gave him a choice — either complain about the Policemen's behavior and be arrested, or be silent about their behavior and go free.  This is proved by the statement of Gutierrez that there are "two ways we can handle this" — Nazario could (1) be charged and arrested for failure to display a

license and for obstruction of justice, and then "fight it," which is his "right as a citizen," or (2) he could "chill" and "let this go." *See* C.V.II at 19:07:20-30, 19:08:20-25.

There can be no dispute that Nazario's theory satisfies the first element of a retaliation claim, because speaking out about the behavior and misconduct of police officers constitutes protected speech. *See City of Houston v. Hill*, 482 U.S. 451, 461 (1987) (ruling that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers"). And the threat of an arrest is "likely [to] deter a person of ordinary firmness from the exercise of First Amendment rights." *See Constantine v. Rectors & Visitors of George Mason University*, 411 F.3d 474, 500 (4th Cir. 2005) (internal quotation marks omitted).

That takes us to the third element of the retaliation claim — the causal link between Lt. Nazario's protected speech and the Policemen's threat of arrest. It is here that Nazario's claim fails as a matter of law. The Supreme Court in *Nieves v. Barlett* ruled that the "presence of probable cause should generally defeat a First Amendment retaliatory arrest claim." *See* 139 S. Ct. at 1726 (2019).[11] This "no-probable-cause" requirement was instituted to address the "complex causal inquir[y]" in determining "whether the adverse

---

[11] The Supreme Court has acknowledged a "narrow qualification" to the rule that probable cause will defeat a retaliatory arrest claim. *See Nieves*, 139 S. Ct. at 1727. That is, in circumstances where the "officers have probable cause to make arrests, but typically exercise their discretion not to do so," the existence of probable cause will not vitiate a retaliatory arrest claim. *Id.* Nazario, however, has not pursued this narrow exception.

government action was caused by the officer's malice or the plaintiff's potentially criminal conduct." *Id.* at 1723-24.[12]

As discussed above, *see* II.B.3, the district court correctly determined that the Policemen had probable cause for the arrestable offense of misdemeanor obstruction of justice under Virginia law. And the existence of probable cause resolves the causation inquiry of the retaliation claim in the Policemen's favor. There was therefore no constitutional violation and the court properly dismissed Lt. Nazario's First Amendment retaliation claim (Count IV).

### D.

Lt. Nazario's final appellate contention is that the district court's incorporation of its probable cause determinations into the jury instructions resulted in reversible error. The challenged instructions are as follows:

> [The court has] determined that at the time that Defendant Crocker initiated the traffic stop . . . he had probable cause to believe that [Nazario] lacked a license plate and was eluding him.

> [The court has] determined that Defendant Crocker had probable cause to believe that [Nazario] committed obstruction of justice without force and failure to obey.

---

[12] The Supreme Court in *Nieves* did not discuss a claim for a threatened retaliatory arrest. *Nieves* involved a claim where the plaintiff was actually arrested, not merely threatened with arrest. We are satisfied, however, that the "no-probable-cause" requirement applies to both claims for actual and threatened retaliatory arrests under the First Amendment. Indeed, the existence (or absence) of probable cause speaks to the causal connection between the "retaliatory animus" and the "subsequent injury," regardless of whether the "subsequent injury" is an actual arrest, or silence in the face of a threat of arrest. *See Nieves*, 139 S. Ct. at 1722.

*See* J.A. 895, 897.[13]

We review a challenge to a trial court's jury instructions for an abuse of discretion, and we must remain conscious that "a trial court has broad discretion in framing its instructions to a jury." *See Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.*, 510 F.3d 474, 484 (4th Cir. 2007). Of course, whether an instruction is a correct statement of law is a question that we review de novo. *See Emergency One, Inc. v. American FireEagle, Ltd.*, 228 F.3d 531, 538 (4th Cir. 2000). And "[e]ven if a jury was erroneously instructed . . . we will not set aside a resulting verdict unless the erroneous instruction *seriously* prejudiced the challenging party's case." *See Bunn v. Oldendorff Carriers GmbH & Co. KG*, 723 F.3d 454, 468 (4th Cir. 2013) (emphasis in original) (internal quotation marks omitted).

Lt. Nazario presents two contentions on how the probable cause instructions — if erroneous — are seriously prejudicial. First, as to the torts of assault, battery, and false imprisonment, the trial court instructed the jury to factor in whether the Policemen had a lawful justification or excuse. Combining these justification and excuse instructions with the probable cause instructions, the jury could have "determined that the [Policemen's] probable cause justified or at least excused their behavior." *See* Appellant's Op. Br. at 47. Second, Nazario argues that probable cause and the relevant offenses were covered during closing arguments. *See* J.A. 865-67 ("The Court has already held, and it's in your

---

[13] During the charge conference, Nazario objected to these instructions on the grounds that the district court's probable cause determination was incorrect. *See* J.A. 857-58. The court noted the objection and did not alter the instructions.

instructions, that there was probable cause for eluding a police officer, for obstruction of justice, and for failure to obey a lawful police order.").

As discussed above, *see* II.B.1-4, the district court erred in its probable cause determination on the misdemeanor eluding offense and the misdemeanor failure to obey offense, but not as to misdemeanor obstruction of justice. Lt. Nazario makes no argument as to how he would be seriously prejudiced by such an error in the probable cause instructions. In our view, however, the degree of prejudice is substantially lessened when there is probable cause for any one of those three offenses. Otherwise put, if there is probable cause for obstruction of justice but not for eluding or failure to obey, the trial court could have nevertheless instructed the jury that the Policemen possessed probable cause to arrest Nazario. In turn, the closing arguments would likely have included statements by counsel that the Policemen had probable cause to arrest Nazario, and the jury could have still factored the presence of probable cause into their verdict. Therefore, Nazario has failed to show that the erroneous instructions seriously prejudiced his trial, and we will not set aside the verdict.

III.

Pursuant to the foregoing, we affirm the district court's award of summary judgment to the Policemen on Counts II and IV, and affirm the judgment in part. We reverse that

aspect of the judgment awarding summary judgment to Gutierrez with respect to Count I only, and remand for such other and further proceedings as may be appropriate.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*

RUSHING, Circuit Judge, dissenting in part and concurring in part:

I would affirm the judgment of the district court in full. I write separately to explain why I would affirm the grant of summary judgment for both officers on Nazario's Fourth Amendment unreasonable seizure and excessive force claims. As Nazario admits, the officers had probable cause to stop him for a traffic violation. They were entitled to order him out of the vehicle during that stop. *Pennsylvania v. Mims*, 434 U.S. 106, 111 (1977) (per curiam). And they did so—more than 40 times—yet Nazario refused to exit the vehicle. Nazario alleges that the officers unreasonably prolonged the traffic stop by training their firearms on him and making threats. I would conclude that neither action violated the Fourth Amendment. Ultimately, the officers used pepper spray to force Nazario out of the vehicle and then insisted he lie on the ground, which he asserts was an excessive use of force. Our precedent makes clear that both officers are entitled to qualified immunity on this claim as well.[1]

## I.

Nazario contends that the officers unconstitutionally prolonged the traffic stop in violation of his Fourth Amendment right "to be secure . . . against unreasonable . . . seizures." U.S. Const. amend. IV. A traffic stop is a seizure, and it can become

---

[1] The district court incorrectly suggested at the first step of its qualified immunity analysis that whether the officers' conduct was reasonable is a question of fact for the jury. *See*, *e.g.*, *Nazario v. Gutierrez*, No. 2:21-cv-169, 2022 WL 3213538, at *12 (E.D. Va. Aug. 9, 2022) ("Given that the reasonableness of an officer's actions is a question for a jury, this count cannot be resolved on summary judgment."). Since then, we have clarified that "the objective reasonableness of officers' conduct is a matter of law to be decided by the court." *Armstrong v. Hutcheson*, 80 F.4th 508, 513 (4th Cir. 2023).

unreasonable if it lasts "longer than is necessary" to effectuate the stop's "mission" of "address[ing] the traffic violation that warranted the stop" and "attend[ing] to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal quotation marks omitted).

At the outset of the traffic stop, the officers pointed their firearms at Nazario and his vehicle; that conduct did not unconstitutionally extend the duration of the stop. Officers performing a lawful traffic stop are entitled "to take such steps as are reasonably necessary to protect their personal safety." *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007) (internal quotation marks and brackets omitted). Attending to those safety concerns is part of the "mission" of a traffic stop and so was not an unreasonable extension. *Rodriguez*, 575 U.S. at 356.

As the district court acknowledged, it was reasonable for these officers' suspicions to be heightened. Nazario was driving a large SUV with tinted windows that obscured the number of occupants. No license plate was visible on the vehicle. Nazario failed to yield to a marked patrol car utilizing lights and sirens. Instead, he slowed to below the speed limit but continued to drive for another minute and forty seconds, traveling approximately a mile and passing roadside streetlights where he could have stopped safely. While a driver might slow down to signal his intention to comply, courts have also recognized that officers may reasonably suspect that the driver and other occupants of the vehicle are using the delay to reach for a weapon, hide contraband, or look for an escape route. *See United States v. Colbert*, 54 F.4th 521, 528 (7th Cir. 2022); *see also*, *e.g.*, *United States v. Canada*,

45

76 F.4th 1304, 1308 (10th Cir. 2023); *Biggs v. City of Md. Heights*, No. 4:20-cv-1499, 2022 WL 1451670, at *7 (E.D. Mo. May 9, 2022).

In view of these facts, the officers were concerned for their safety and conducted a "high risk" stop by drawing their firearms and taking shelter behind their patrol cars before slowly approaching Nazario's vehicle with weapons drawn until they could determine they were not in danger. That conduct was directly related to the purpose of the traffic stop: determining why the vehicle lacked a license plate and whether Nazario had been eluding them, while ensuring their own safety.[2] Because this conduct advanced the mission of the traffic stop, it did not unconstitutionally prolong it, and the officers did not seize Nazario in violation of the Fourth Amendment.

The majority concludes that Officer Crocker is entitled to qualified immunity on the unreasonable seizure claim, correctly reasoning that it was not clearly established that "the simple act of a police officer pointing firearms at a person during a traffic stop" would be unconstitutional. Maj. Op. 31. As the majority observes, our Court has never addressed that question. In fact, the majority cites *no court* that has ever held that pointing firearms at a person unreasonably prolonged a traffic stop. The cases the majority cites about "hold[ing] a person at prolonged gunpoint when he is compliant and presents no danger"

---

[2] I would hold that the officers had probable cause to think Nazario was eluding them in violation of Virginia law, although their conduct did not unconstitutionally prolong the stop regardless. Eluding occurs when a person drives in "willful and wanton disregard of" "a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop." Va. Code Ann. § 46.2-817(A). A prudent officer could reasonably believe that driving for over a mile after hearing and seeing a patrol car's signals, past well-lit areas with space to safely stop, demonstrates willful and wanton disregard for the officer's signal.

have nothing to do with extending a traffic stop beyond its lawful purposes; they all addressed excessive force claims.[3]  Maj. Op. 29 & n.9.  Here, however, Nazario has expressly waived an excessive force claim based on the officers brandishing their firearms.  *See* Oral Arg. 11:14–11:23 (Question: "So you're not arguing that drawing their weapons was an excessive use of force?"  Answer: "Not in this . . . no, no, no your honor, I'm not.").

Officer Gutierrez is also entitled to summary judgment on Nazario's unreasonable seizure claim, contrary to the majority's conclusion.  Like Officer Crocker, Officer Gutierrez drew his weapon on Nazario at the outset of the traffic stop and commanded him to step out of the vehicle.  But the majority holds that Officer Gutierrez violated clearly established law because he made two unprofessional threats to Nazario after he had holstered his gun and drawn his taser: first, he told Nazario, "You're fixin' to ride the lightning, son," and second, he responded to Nazario's protestation that he was afraid to step out of the car by saying, "You should be."  Gutierrez Camera, 3:06–3:10; Nazario Phone 1, 1:29–1:35; Crocker Camera 1, 3:55–3:57.  In total, these comments took about four seconds.

---

[3] Furthermore, the three cases the majority cites are vastly different from the factual scenario here.  In *Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (per curiam), the officer was accused of "keeping [his] weapon trained on [an] infant," and in *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1193 (10th Cir. 2001), the officers aimed their firearms at "child bystanders" during a SWAT raid.  In *Baird v. Renbarger*, 576 F.3d 340, 342 (7th Cir. 2009), the officer used a 9-millimeter submachine gun to detain people who presented no resistance during a search for evidence of a nonviolent crime when there was no suggestion that anyone at the search location was armed or dangerous.

These threats may have been "outside the tasks required to complete the mission of [the] traffic stop." Maj. Op. 32. But they did not "'measurably extend the duration of the stop,'" which is an essential element of Nazario's Fourth Amendment claim. *Rodriguez*, 575 U.S. at 355 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)); *see*, *e.g.*, *Soriano-Jarquin*, 492 F.3d at 501 ("[P]olice questioning that does not prolong a seizure does not provide a legitimate basis for a Fourth Amendment claim."). And the comments certainly did not constitute a Fourth Amendment violation so clearly established that "every reasonable official" would know that what he is doing is unlawful. *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). Indeed, the majority admits there is no precedent holding that an officer's comments during a traffic stop unreasonably prolonged the stop or otherwise violated a driver's Fourth Amendment rights. Maj. Op. 32. Because Officer Gutierrez's comments did not prolong the traffic stop, I would affirm summary judgment in favor of Officer Gutierrez and Officer Crocker on Nazario's Fourth Amendment unreasonable seizure claim.

## II.

Turning to Nazario's excessive force claim, the majority affirms the district court's judgment that the officers are entitled to qualified immunity. That is the correct conclusion. At oral argument, Nazario's counsel identified four actions he claims were an excessive use of force: spraying Nazario with pepper spray, striking the back of his knee, taking Nazario all the way to the ground, and placing him in handcuffs. Oral. Arg. 11:00–11:17. The officers are entitled to qualified immunity because the law did not clearly establish that any of these actions violated Nazario's Fourth Amendment rights.

We recently held that, at the time of Nazario's stop, it was not clearly established that an officer could not pepper spray a driver who repeatedly failed to comply with the officer's commands to exit the vehicle during a lawful roadside stop and resisted arrest in a circumstance dangerous for the officer.[4]  *Omeish v. Kincaid*, 86 F.4th 546, 557 (4th Cir. 2023).  That precedent governs here.  Similarly, the officers did not violate any clearly established right by using a single knee strike to lower a noncompliant arrestee to the ground and place him in handcuffs.  *See*, *e.g.*, *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002) ("[A] standard procedure such as handcuffing would rarely constitute excessive force where the officers were justified, as here, in effecting the underlying arrest.").  Because none of the actions Nazario challenges violated his clearly established rights, the officers are entitled to qualified immunity on his excessive force claim.

For the foregoing reasons, I would affirm the judgment of the district court in full.

---

[4] As the majority explains, the officers here had probable cause to arrest Nazario for obstruction of justice, although they did not have probable cause to arrest him for failing to obey a conservator of the peace.  Because the officers had probable cause to arrest Nazario, they are entitled to summary judgment on the retaliation claim; for the same reason, the jury instructions were not reversibly erroneous.